IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. _____5:23-CV-00723_____

|  |  |  |
|---|---|---|
| ATTICUS, LLC, | ) | |
| | ) | |
| *Plaintiff*, | ) | **COMPLAINT FOR DECLARATORY** |
| | ) | **JUDGMENT OF NON-INFRINGEMENT** |
| v. | ) | |
| | ) | |
| FMC CORPORATION, | ) | |
| | ) | |
| *Defendant*. | ) | |

Plaintiff Atticus, LLC ("Atticus") alleges as follows for its Complaint for Declaratory Judgment of Non-Infringement against FMC Corporation ("FMC"):

## NATURE OF THE ACTION

1.     This action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the patent laws of the United States, 35 U.S.C. § 1 *et seq.*  Atticus seeks a declaration that U.S. Patent Nos. 8,530,382 (hereinafter "the '382 patent"), 8,709,513 (hereinafter "the '513 patent"), 9,826,737 (hereinafter "the '737 patent"), and 9,332,756 (hereinafter "the '756 patent") are not infringed by Atticus's imminent making, using, offering to sell, selling, and/or importing of its chlorantraniliprole-containing pesticide products.

## PARTIES

2.     Plaintiff Atticus is a limited liability company organized and existing under the laws of the State of North Carolina, with its principal place of business at 940 NW Cary Parkway, Suite 200, Cary, North Carolina 27513.

3.     On information and belief, Defendant FMC is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 2929 Walnut Street, Philadelphia, Pennsylvania 19104.

1

## JURISDICTION AND VENUE

4.      This Court has subject-matter jurisdiction over the claims alleged in this action under 28 U.S.C. §§ 1331, 1338, 2201, and 2202 because this Court has exclusive jurisdiction over declaratory judgment claims arising under the patent laws of the United States.

5.      This Court can provide the declaratory relief sought in this Complaint because an actual case or controversy exists between the parties within the scope of this Court's jurisdiction pursuant to 28 U.S.C. § 2201.  As detailed herein, a real and immediate controversy exists between the parties to this lawsuit.

6.      This Court has personal jurisdiction over FMC because FMC has continuous and systematic contacts within this district.  FMC has engaged in actions in this district that form the basis of Atticus's claims against FMC.

7.      FMC is registered to conduct business throughout the State of North Carolina.  The office of its registered agent is located at 160 Mine Lake Ct., Suite 200, Raleigh, North Carolina, 27615-6417 and is in this district.

8.      On information and belief, FMC has offices in the State of North Carolina, including at 1115 Bessemer City-Kings Mountain Hwy, Bessemer City, North Carolina 28016 and at 2801 Yorkmont Rd., Suite 300, Charlotte, North Carolina 28208.

9.      On information and belief, FMC further sells its products directly to residents of the State of North Carolina.  For example, FMC sells its products directly to citizens of this district through retail companies such as Do My Own (www.domyown.com), a company that sells FMC products, including Coragen® (which contains chlorantraniliprole) to customers throughout the United States, including North Carolina.  *See* https://www.domyown.com/dupont-coragen-insect-control-p-21788.html.

10.      On information and belief, FMC has multiple dedicated employees and/or agents who are responsible for substantial product sales and services in the district, including chlorantraniliprole products.

11.      On information and belief, FMC has licensed one or more chlorantraniliprole-related patents (including the FMC patents that are the subject of this action) to one or more companies, including

2

UPL, Syngenta, Corteva, and Albaugh, to sell chlorantraniliprole products in this district and throughout the United States.

12.     Venue is proper in this district under 28 U.S.C. §§ 1391 and/or 1400.

13.     Under 28 U.S.C. § 1391(b)(1), venue is proper in any judicial district where a defendant resides if all defendants are residents of the State in which the district is located.  Under 28 U.S.C. § 1391(c)(2), an entity with the capacity to sue and be sued, such as FMC, is deemed to reside in any judicial district in which the defendant is subject to the Court's personal jurisdiction with respect to the civil action in question.  As alleged herein, FMC is subject to the Court's personal jurisdiction with respect to the civil action in question.

14.     FMC regularly conducts business in this district through dedicated agents and/or employees who are responsible for significant product sales and services in the district.  FMC's registered agent for the State of North Carolina is located in this district.

15.     Venue is also proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

16.     Venue is also proper pursuant to 28 U.S.C. § 1400(b), insofar as FMC has accused Atticus of infringing its patents based and FMC would have to file its patent infringement action in this district because Atticus resides in this district and because Atticus's actions have occurred in this district and Atticus has a regular and established place of business in this district.

<u>ALLEGATIONS</u>

**I.  Atticus is a Demand-Driven Manufacturer of Alternative-Source, Post-Patent Agricultural Products**

17.     Based in Cary, North Carolina, Atticus is a demand-driven manufacturer of branded post-patent products.  Atticus was founded in 2014 by Randy Canady, an industry veteran with extensive experience in the agricultural chemical industry.  Mr. Canady and his team started Atticus after long and successful employments at other companies in the agricultural chemical industry, including Etigra, BASF, Bayer CropScience, UAP, and Syngenta.

3

18.     Atticus focuses on developing and marketing post-patent pesticides—meaning pesticidal products for which primary U.S. patent protection has expired.  Atticus has an extensive team of seasoned professionals with diversified experience and perspectives garnered from decades of experience with the major companies in the agricultural chemical industry.  Atticus's "experience web" is extensive, as depicted in the following graphic.



*See* https://atticusllc.com/about-us/.

19.     In the relatively short period of ten years, Atticus has developed an extensive portfolio of branded-generic fungicides, herbicides, and insecticides across all sectors of the agricultural chemical industry.

20.     Atticus currently markets and sells over eighty active ingredients for pesticides, ranging from fungicides, herbicides, insecticides, insect growth regulators, and plant growth regulators.  *See* https://atticusllc.com/technical-ai/.  This portfolio includes the majority of post-patent active ingredients used by consumers in the agricultural chemical industry, such as azoxystrobin, bifenthrin, and mesotrione.  Atticus is continuing to develop new post-patent active ingredients, including chlorantraniliprole.

21.     Atticus also currently markets and sells an extensive portfolio of end-use products ("EUPs") to serve the agricultural markets.  In the agriculture sector, Atticus has obtained more than 100

registrations with Environmental Protection Agency ("EPA") and has many additional registrations pending. Atticus also has an extensive portfolio of EUPs for use in the non-agricultural markets. Atticus markets its portfolio under its EcoCore™ brand, which includes products for use in the turf and ornamental, golf course, greenhouse and nursery, pest and vector control, vegetation management, aquatic, and other non-agricultural sectors. *See* https://atticusllc.com/ecocore-products/. Atticus has obtained over 80 EPA registrations for its EUPs and has many additional registrations pending for its EcoCore™ portfolio of products. Atticus is also a leader and responsible steward in the pesticide industry. Atticus is a member of several important task forces that support the industry and its workers, with the goal of ensuring good stewardship and the safe and responsible use of pesticidal products. Atticus also works to advance the future of agriculture and its EcoCore™ markets by supporting organizations that shape tomorrow's leaders.

22.     The Atticus team employs the power of partnership to support the industry, end-users, retail customers, and all who make it what it is. *See* https://atticusllc.com/about-us/. Atticus is a member of many key agricultural industry task forces and working groups, including the following:

      a.     Bifenthrin Task Force Joint Venture;

      b.     Dicamba Registrants Coalition, LLC Joint Data Development;

      c.     Industry Task Force II  on 2,4-D Research Data;

      d.     Pyrethroid Working Group;

      e.     TM/MBC Task Force;

      f.     Non-Dietary Exposure Task Force;

      g.     Agricultural Handler Exposure Task Force;

      h.     Agricultural Reentry Task Force;

      i.     Generic Residential Exposure Task Force;

      j.     Outdoor Residential Exposure Task Force; and

      k.     Spray Drift Task Force.

*See* https://atticusllc.com/about-us/.

23.     Atticus also is actively involved with many industry associations including:

5

    a.        CropLife America;

    b.        Responsible Industry for a Sound Environment;

    c.        Council of Producers & Distributors of Agrotechnology;

    d.        Agricultural Retailers Association;

    e.        Western Plant Health Association;

    f.        California Association of Pest Control Advisers; and

    g.        Ag Container Recycling Council.

*See* https://atticusllc.com/about-us/.

24.        Atticus has successfully developed its post-patent portfolio through careful and responsible effort.  Atticus conducts due diligence to ensure that the products it makes, uses, sells, offers for sale, and imports do not infringe any party's valid intellectual property rights.

## II.  EPA Registration of Pesticides

25.        The distribution and selling of pesticides used in U.S. agricultural and non-agricultural sectors are regulated by EPA.  The primary federal law governing pesticide distribution and sale in the United States is the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 61 Stat. 163, and codified at 7 U.S.C. § 136 *et seq.*  EPA is the primary federal agency tasked with implementing FIFRA.

26.        EPA has promulgated regulations for applying FIFRA and related laws governing the production, sale, and distribution of pesticides, as set forth in Subchapter E of Title 40 of the Code of Federal Regulations.  EPA also provides guidance about the pesticide registration process, which it sets forth in its *Pesticide Registration Manual*, available at https://www.epa.gov/pesticide-registration/pesticide-registration-manual.

27.        EPA defines a "pesticide product" as "a pesticide in the particular form (including composition, packaging, and labeling) in which the pesticide is, or is intended to be, distributed or sold.  The term includes any physical apparatus used to deliver or apply the pesticide if distributed or sold with the pesticide," as set forth in 40 C.F.R. § 152.3.

28.        Under § 3 of FIFRA, EPA can register a pesticide product for distribution, sale, and use

6

throughout the United States. Pesticide registration is generally based on one of three categories for the pesticide: (a) new chemical or new active ingredient; (b) new use; or (c) identical/substantially similar product (formerly referred to as a "me-too" product).

29.     The EPA also registers a pesticide product as one of several different categories. Three common types of pesticide products are: (1) products containing primarily the "technical grade of active ingredient" ("TGAI"); (2) an end-use product ("EUP"); and (3) manufacturing-use product ("MUP").

30.     An "active ingredient" is "any substance (or group of structurally similar substances if specified by the Agency) that will prevent, destroy, repel or mitigate any pest, or that functions as a plant regulator, desiccant, or defoliant within the meaning of FIFRA sec. 2(a), except as provided in § 174.3 of this chapter [i.e., Chapter I]," as EPA has defined in 40 C.F.R. § 152.3. An "inert ingredient" is "any substance (or group of structurally similar substances if designated by the Agency), other than an active ingredient, which is intentionally included in a pesticide product, except as provided by § 174.3 of this chapter [i.e., Chapter I]," as set forth in § 152.3 in Title 40 of the Code of Federal Regulations. These inert ingredients, however, do not need to be the same as the already-registered formulation. If the formula is changed by the generic manufacturer, the change must be approved by EPA.

31.     "TGAI" is defined as "a material containing an active ingredient: (1) Which contains no inert ingredient, other than one used for purification of the active ingredient; and (2) Which is produced on a commercial or pilot plant production scale (whether or not it is ever held for sale)," as set forth in 40 C.F.R. § 158.300.

32.     An "EUP" "means a pesticide product whose labeling: (1) Includes directions for use of the product (as distributed or sold, or after combination by the user with other substances) for controlling pests or defoliating, desiccating or regulating growth of plants, or as a nitrogen stabilizer, and (2) does not state that the product may be used to manufacture or formulate other pesticide products," as set forth in 40 C.F.R. §§ 152.3 and 158.300.

33.     An "identical" or "substantially similar" pesticide registration application refers to a request to register a new pesticide product that is: identical in its uses and formulation; or substantially similar

in its uses and formulation to one or more products that are currently registered and marketed in the United States; or differs only in ways that would not significantly increase the risk of unreasonable adverse effects on the environment, as referred to in 40 C.F.R. § 152.113. FIFRA authorizes the expedited registration of an identical or substantially similar pesticide product when the EPA determines that the product meets the statutory and regulatory requirements, as set forth in 7 U.S.C. § 136a(c)(7) and 40 C.F.R. §§ 152.113 and 152.115.

34. Under FIFRA § 3(c)(1)(F)(i), a registrant is granted a ten-year period of exclusive use for data submitted in support of a registration for a new pesticide chemical or registration for a new use of an already existing pesticide. Additionally, the period of exclusivity can be extended one year for each three qualifying "minor uses" that are registered within seven years of the original registration, "up to a total of 3 additional years for all minor uses registered," as set forth in 7 U.S.C. § 136a(c)(1)(F)(ii).

35. In addition to federal registration, under FIFRA § 24(a), "[a] State may regulate the sale or use of any federally registered pesticide or device in the state, but only if and to the extent that the regulation does not permit any sale or use prohibited by this Act." Many states require the registration of pesticide products, and the registration requirements vary from state to state. Many states do not undertake a separate assessment of safety and efficacy and instead rely on federal EPA registration. In such cases, the state will typically approve the pesticide product within approximately thirty days of registration submission.

III. **Identical and Substantially Similar Pesticides Provide Cost-Effective Alternatives for American Agriculture**

36. Identical/substantially similar pesticide products and the expedited approval process are core aspects of the FIFRA framework. Identical/substantially similar pesticide products are often referred to as "generic" pesticides, and generic pesticides provide numerous economic advantages to U.S. farmers, consumers, and other users in the U.S. agricultural and non-agricultural economies. Generic pesticides are products that contain the same active ingredient or ingredients as a prior registrant. Generic pesticides are typically "off-patent," meaning that patent protection for the chemical compound has expired. Generic pesticides help thousands of farmers who use them on hundreds of crops at substantial cost savings

8

compared to the product of the original manufacturer.

37.     Generic and branded off-patent pesticides, such as those offered by Atticus, are equally as safe and effective as the pesticide products offered by the larger companies at higher prices.  After all, to obtain an EPA registration, EPA must conclude that the composition of the generic product is identical or substantially similar to an existing pesticide product.  The form of the generic pesticide product must also be the same as, or substantially similar to, the branded pesticide product.  Similarly, the product label of the generic pesticide must be identical or substantially similar to the already registered product.

38.     Generic manufacturers are also held to the same EPA standards with regards to the quality and safety of the inert ingredients.  The average price for generic pesticides is typically lower for many reasons, including, for example, increased efficiencies in the manufacturing, distribution, and sales process, multiple companies manufacturing and selling the pesticides rather than a single supplier, and increased competition in the pesticide marketplace.

**IV.  Chlorantraniliprole Registration History**

39.     The real and immediate controversy of the present dispute between Atticus and FMC stems from Atticus's development and plans to market chlorantraniliprole products.  Chlorantraniliprole is now what is referred to in the industry as an "off-patent" active ingredient by virtue of the expiration of composition of matter patents claiming chlorantraniliprole itself.

40.     Chlorantraniliprole is an insecticide of the anthranilic diamide class.  Chlorantraniliprole has the following chemical structure:



41.     Chlorantraniliprole  is  most  active  on  chewing  insects.   Chlorantraniliprole  works  by

disrupting normal muscle contractions in insects by activating their ryanodine receptors, causing an unregulated release of calcium from muscle cells. This release causes paralysis and eventually leads to death of the insect. From a safety standpoint, chlorantraniliprole has differential selectivity towards insect ryanodine receptors and therefore exhibits low mammalian toxicity.

42.     Chlorantraniliprole was first developed by E.I. du Pont De Nemours and Company ("DuPont"). FMC did not develop chlorantraniliprole in the first instance. Rather, as part of DuPont's merger with Dow Chemical, DuPont was required to divest portions of its crop protection business in order to comply with regulatory demands related to the DuPont/Dow merger. FMC purchased portions of DuPont's agricultural and crop protection business, which included chlorantraniliprole, as publicly reported here: https://www.dupont.com/news/dupont-announces-agreement-with-fmc.html.

43.     Chlorantraniliprole was disclosed in a family of U.S. patents, including U.S. Patent No. 7,232,836 ("the '836 patent"). The international application for the '836 patent was filed on August 13, 2002, and it claims priority to several earlier-filed patent applications, the earliest of which was filed on August 13, 2001. The '836 patent issued on June 19, 2007. On information and belief, the '836 patent expired on December 1, 2022.

44.     In January 2007, DuPont filed its application to register chlorantraniliprole as a new chemical or active ingredient with EPA. EPA approved DuPont's application to register a chlorantraniliprole TGAI product on or around April 25, 2008.

45.     Pursuant to FIFRA § 3(c)(1)(F)(i), DuPont received a ten-year period of data-use exclusivity for the testing submitted in connection with that application. The data-use exclusivity prevents EPA from allowing any subsequent potential registrant from relying on DuPont's submitted data in order to register a different chlorantraniliprole pesticide product. The data exclusivity serves as a *de facto* exclusivity in the market for the initial registrant (here DuPont), unless a subsequent potential registrant repeats the studies and submits data from its own studies.

46.     For chlorantraniliprole, as stated by EPA, the ten-year exclusivity period on data usage was set to expire on April 25, 2018.

47.     On January 5, 2011, DuPont petitioned for a three-year extension of data exclusivity pursuant to FIFRA § 3(c)(1)(F)(ii). On January 14, 2016, EPA determined that DuPont had met FIFRA § 3(c)(1)(F)(ii) requirements for registration of ten minor uses within the requisite seven-year window. EPA thus extended DuPont's data-exclusivity period for chlorantraniliprole by three years (one year for three groups of three studies) to April 25, 2021.

48.     On information and belief, on or about March 31, 2017, DuPont transferred its data-exclusivity chlorantraniliprole rights to FMC in connection with its divestiture of the chlorantraniliprole franchise to FMC and other entities.

49.     All told, consistent with FIFRA and the established regulatory scheme designed to encourage investment in safe and effective pesticides, DuPont and subsequently FMC obtained a total of thirteen years of EPA data exclusivity, and it has been over twenty-three years since chlorantraniliprole was disclosed in the first patent application.

50.     As of April 26, 2021, EPA data exclusivity for chlorantraniliprole is expired.

## V. FMC's Aggressive Efforts to Protect FMC's Core Chlorantraniliprole Franchise

51.     When FMC acquired the chlorantraniliprole business from DuPont, the investment community viewed FMC's acquisition as extremely important for FMC's business success. Without the acquisition, FMC would be viewed as having "a stranded, lower-quality agrichemical portfolio due to investor concerns over the strength of the R&D pipeline."

52.     Since obtaining its rights to chlorantraniliprole from DuPont, FMC has made chlorantraniliprole products a core business focus in the crop-protection area. FMC currently brands its chlorantraniliprole active ingredient as Rynaxypyr®. It also markets and sells its chlorantraniliprole EUPs under the Altacor®, Coragen®, Elevest®, Prevathon®, and Vantacor® brands.

53.     For example, on August 1, 2024, FMC's President Ronaldo Pereira stated: "Diamides have been a core part of our business since we launched FMC as a pure-play agricultural sciences company in 2018. In these almost-seven years, we have grown our partner base and expanded our geographic footprint. Through new product registrations we have introduced brand new patented formulations that allow us to

enter new markets and crop segments."

54.     On information and belief, and as exemplified by FMC's actions detailed herein, chlorantraniliprole is a product that FMC will vigorously defend at virtually any cost, despite the fact that the thirteen-year period of exclusivity for its chlorantraniliprole registrations expired more than three years ago and chlorantraniliprole was first disclosed in a patent application filed more the twenty-three years ago.

55.     FMC has a "Brand Protection" webpage detailing that its intellectual property enforcement efforts are a key aspect of its business strategies. FMC's "Brand Protection" statement also asserts, in no uncertain terms, that "FMC is committed to product stewardship, sustainability and vigorously defending our intellectual property."

56.     As part of its overall "brand protection" strategy, "FMC believes in innovation and in protecting that innovation through intellectual property rights." FMC accomplishes this by, *inter alia*, obtaining and enforcing patents in the United States and abroad.

57.     FMC also strategically selects partners to license its patents and sell certain chlorantraniliprole products.

58.     FMC actively pursues this strategy through its use of "limited patent, data and/or trademark licenses as well as long-term commitments to purchase [chlorantraniliprole] active ingredients from FMC." According to FMC, "[s]uch partner relationships allow [FMC] to grow [its] business by having others develop and sell [chlorantraniliprole] products to meet . . . needs not within [its] current portfolio." These agreements typically require partners to purchase chlorantraniliprole from FMC. FMC's multi-pronged strategy, including vigorous enforcement of its patent rights and selective licensing to limited partners, allows FMC to maintain its chlorantraniliprole market share and pricing and control sourcing of chlorantraniliprole further minimizing competition from other companies seeking to market competitive chlorantraniliprole products. As of December 2019, according to FMC, it had entered into four global agreements and forty-one separate local-country agreements covering eleven countries. FMC has continued to license select competitors for purchasing FMC-sourced chlorantraniliprole.

59.     For example, on March 1, 2021, FMC announced that it had partnered with UPL Ltd.

12

("UPL"), as reported at the following: https://www.prnewswire.com/news-releases/fmc-corporation-an-nounces-long-term-collaboration-with-upl-ltd-for-rynaxypyr-active-ingredient-301237256.html; https://investors.fmc.com/news/news-details/2021/FMC-Corporation-Announces-Long-Term-Collabora-tion-with-UPL-Ltd.-for-Rynaxypyr-Active-Ingredient/default.aspx.

60.     FMC granted UPL rights to sell FMC chlorantraniliprole products "in select markets," to manufacture chlorantraniliprole on FMC's behalf for sale in India, and "in the future" to sell UPL chlorantraniliprole technical for use in UPL-developed pesticide products, as reported at the following: https://www.upl-ltd.com/press_release/d0pURFgPyqw9UYTpsiiuytyvrrT2KcNMFZOHjx9k.pdf.

61.     On information and belief, in 2012, DuPont entered into a transaction with Syngenta (as Syngenta AG and/or Syngenta Crop Protection, LLC) in which Syngenta acquired DuPont's Professional Products insecticide business. As a result of this transaction, Syngenta acquired several chlorantraniliprole-based insecticide brands from DuPont, including Altriset®, Acelepryn®, and Calteryx®, as reported at the following: https://www.syngenta-us.com/newsroom/news_release_detail?id=169537

62.     On information and belief, DuPont transferred to Syngenta the necessary regulatory rights for Syngenta to market and sell certain chlorantraniliprole products. As one example, Syngenta obtained a license from DuPont to sell chlorantraniliprole in mixtures with Syngenta active ingredients as reported at the following: https://www.syngenta.com/sites/syngenta/files/company/bond-investors/financial-re-sults/2015-form-20-f.pdf. On information and belief, the licensing arrangement continued after FMC ob-tained its chlorantraniliprole rights from DuPont.

63.     On information and belief, DuPont and FMC entered into a supply agreement in 2017 when FMC obtained rights to chlorantraniliprole from DuPont in 2017.

64.     On information and belief, in 2021, FMC also entered into an agreement with Corteva Agriscience to supply chlorantraniliprole for seed treatment products, as reported at the following: https://investors.fmc.com/news/news-details/2021/FMC-Corporation-signs-agreements-with-Corteva-Agriscience-to-provide-growers-seed-treatment-insecticides/default.aspx.

65.     On information and belief, the FMC-Corteva supply agreement also included rights and/or

licenses to certain FMC patents covering chlorantraniliprole, methods of making chlorantraniliprole, formulations containing chlorantraniliprole, and/or methods of using chlorantraniliprole.

66. On information and belief, Corteva currently sells chlorantraniliprole EUPs in the United States, including Dermacor X-100 and Lumivia.

**A. FMC's Aggressive Litigation Efforts**

67. As part of its strategy to protect its chlorantraniliprole business, FMC regularly initiates lawsuits throughout the world against companies that FMC perceives to be competitors and/or potential competitors in the diamide market. FMC's vigorous protection strategy complements its practice of selectively licensing limited rights to purchase FMC's chlorantraniliprole.

68. FMC has explained that one of its six "pillars" of its "diamide lifecycle strategy" is its "IP & Regulatory" pillar, which states that "FMC will defend rights and litigate infringements." FMC's "IP & Regulatory" pillar is the aspect of its business strategy where FMC intends to delay, for as long as possible, the entry of competitors into the chlorantraniliprole market. FMC described its "IP & Regulatory" pillar during its 3Q 2023 investor call and in its accompanying slide presentation, as shown below:



69. In the same presentation, FMC provided the following graphic, indicating that it has issued and pending U.S. patent protection for chlorantraniliprole formulations and mixtures, that this U.S. patent protection covers, for example, FMC's Vantacor® insect control formulation, and that this U.S. patent

protection can allegedly extend to at least 2040.



70.　　Consistent with its "IP & Regulatory" pillar and its overall "diamide lifecycle strategy," FMC has engaged in a global campaign to limit and delay competition in the chlorantraniliprole markets throughout the world. FMC achieves this, in part, through its highly public and aggressive assertion of intellectual property rights, including not only patents covering chlorantraniliprole itself but also patents that claim methods of manufacturing chlorantraniliprole or intermediates thereof, patents claiming methods of using chlorantraniliprole, and patents relating to formulations of chlorantraniliprole.

71.　　Based on public records and FMC's public statements, FMC has brought numerous patent actions in the United States, China, and India against companies who started or attempted to start marketing chlorantraniliprole-containing pesticide products before the expiration of FMC's chlorantraniliprole-related patents. In 2021, FMC publicly stated that it has "enforced [its] patents and obtained preliminary injunctions or settlements against six infringers in India," and that it "commenced litigation against four infringers in China." FMC publicly announced the existence of another dispute and subsequent resolution in Australia. Some of FMC's patent actions are summarized herein.

72.　　FMC's litigation efforts are often brought early in the regulatory approval process—before competitors have received regulatory approval to sell chlorantraniliprole products.

***FMC Corp. v. Albaugh, LLC, No. 4:24-cv-00055-SHL-HCA (filed February 12, 2024)***

73.　　On February 12, 2024, FMC sued Albaugh, LLC ("Albaugh") in the United States District Court for the Southern District of Iowa asserting that Albaugh's efforts to seek to market a generic chlorantraniliprole product was an act of patent infringement. That case was captioned as *FMC Corp. v. Albaugh, LLC*, No. 4:24-cv-00055-SHL-HCA (D. Iowa. filed Feb. 12, 2024). FMC sued Albaugh, despite the lack of any allegation in the complaint that Albaugh has made a single sale or offer to sell a

15

chlorantraniliprole product.

74.     FMC's lawsuit alleged that, "[o]n information and belief, [Albaugh] has made, imported, and/or used chlorantraniliprole or products containing chlorantraniliprole, including [Albaugh's] 'Exceliprole 4SC' product . . . in the United States in violation of one or more [FMC patents]."

75.     The Albaugh complaint alleged that FMC provided a notice letter on November 3, 2023, that identified FMC's "concerns" that Albaugh's registration activities "infringed one or more patents owned by FMC."  Albaugh allegedly did not respond to FMC's request for information from Albaugh concerning the confidential process details for making chlorantraniliprole.

76.     Moreover, FMC alleged that Albaugh's 4SC chlorantraniliprole product had not yet been approved by EPA.  FMC nevertheless filed its lawsuit alleging patent infringement by Albaugh.

77.     The parties proceeded to litigate the dispute, and, on November 14, 2024, FMC issued a public press release noting that the dispute with Albaugh had been resolved.  FMC stated that it has "reached a settlement agreement with Albaugh LLC resolving patent infringement litigation related to the manufacture of chlorantraniliprole, FMC's leading insecticide ingredient branded as Rynaxypyr® active."

78.     In the press release, FMC again touted its "extensive" patent portfolio that it has repeatedly enforced against potential competitors in the chlorantraniliprole market:

> FMC maintains an extensive patent estate for its chlorantraniliprole technology in the U.S., China, India, and other key agricultural markets worldwide. The company markets several products containing chlorantraniliprole, including Altacor®, Coragen®, Elevest®, Prevathon® and Vantacor® insect control.

***FMC Corp. v. Aceto US, LLC, No. 1:22-cv-00586-CFC (D. Del. Filed May 2, 2022)***

79.     On May 2, 2022, FMC sued Aceto US, LLC ("Aceto") in the United States District Court for the District of Delaware for infringement of FMC's chlorantraniliprole patents directed to the chlorantraniliprole active ingredient and a process to manufacture chlorantraniliprole.  That action was captioned as *FMC Corp. v. Aceto US, LLC*, No. 1:22-cv-00586-GBW (D. Del. filed May 2, 2022).

80.     FMC asserted infringement against Aceto based, in part, on the following allegation: "Aceto sought to obtain, did actually obtain, and received and used imported shipments of

chlorantraniliprole in the United States. Aceto obtained these shipments from various overseas manufacturers. These manufacturers, include, but may not be limited to Natco Pharma Limited, and Jiangsu Agrochem Laboratory Ltd."

81. FMC did not allege that FMC and Aceto had any communications concerning chlorantraniliprole before FMC filed the action. FMC also did not allege that Aceto had any imminent plans to launch any chlorantraniliprole EUPs.

82. On May 4, 2022, FMC issued a press release in connection with its lawsuit against Aceto. FMC noted that the allegations of infringement were based on "shipments of chlorantraniliprole from suppliers in India and China in violation of FMC's patent rights." FMC requested "damages and injunctive relief restraining Aceto from infringing FMC patents relating to chlorantraniliprole."

83. In connection with the Aceto action, FMC's general counsel issued a warning to potential competitors and potential customers when he stated:

> FMC has received numerous patents around the world that protect compositions and processes relating to chlorantraniliprole and its production . . . . We will continue to protect our investment in researching, developing and commercializing chlorantraniliprole by vigorously enforcing our intellectual property rights in the United States and worldwide.

84. On information and belief, FMC filed the lawsuit against Aceto and issued the press release to send a message to the relevant marketplace and potential competitors, such as Atticus, that even the smallest shipment of chlorantraniliprole into the United States, regardless of purpose, would be met with a prompt lawsuit from FMC.

85. On information and belief, FMC's action against Aceto was preemptively brought by FMC to forestall Aceto's efforts to obtain regulatory approval for chlorantraniliprole EUPs and/or to delay Aceto's introduction of one or more competing chlorantraniliprole products.

86. On information and belief, at the time FMC filed its complaint against Aceto, Aceto had not obtained any EPA registration to distribute or sell any chlorantraniliprole EUPs.

87. On June 23, 2022, Aceto answered the complaint stating: "Aceto admits that it received two small shipments of chloranatraniliprole for testing purposes from Natco Pharma Limited and Jiangsu

Agrochem Laboratory Ltd. Aceto otherwise denies all remaining allegations in paragraph 20 of the Complaint."

88.     On information and belief, FMC sued Aceto solely based on Aceto's importation of two small shipments of chlorantraniliprole for "testing purposes." FMC further sought damages and injunctive relief based on Aceto's circumscribed actions. On information and belief, FMC sued Aceto without any advance discussions with Aceto concerning the alleged infringement. The complaint was subsequently dismissed on November 11, 2022, pursuant to stipulation by FMC.

**FMC v. COFEPRIS/Rainbow Agro Sciences, S.A.**

89.     On September 11, 2023, FMC (and/or an FMC affiliated entity) filed an action in Federal Court in Mexico against the Federal Committee for Protection from Sanitary Risks ("COFEPRIS"), seeking to prevent the registration of Rainbow Agro Sciences, S.A. De C.V.'s ("Rainbow") generic chlorantraniliprole product. COFEPRIS is Mexico's equivalent of EPA in that both agencies have responsibilities governing the registration of pesticide products in their respective countries. FMC sought to block Rainbow's regulatory application because based on an FMC patent covering a process for making chlorantraniliprole was in effect at the time Rainbow filed its application with COFEPRIS.

90.     On April 14, 2024, FMC issued an aggressive press release confirming that FMC will "vigorously defend" its chlorantraniliprole intellectual property, even after losing its dispute with Rainbow.

91.     FMC's action against Rainbow is yet another example of FMC's aggressive tactics, bringing patent infringement lawsuits even before regulatory approvals for competitive products have issued. Here, FMC lost, yet it has expressed its desire to continue to litigate this issue.

**FMC Corp. v. Imtrade**

92.     In 2023, FMC (and/or an FMC affiliated entity) also engaged in a dispute with Imtrade CropScience ("Imtrade") in Australia concerning Imtrade's intention to obtain regulatory approval to market and sell chlorantraniliprole products.

93.     On October 2023, FMC sent a notice letter to Imtrade for importing chlorantraniliprole into Australia and using the imported chlorantraniliprole without FMC's authorization.

18

94.     On May 16, 2024, FMC issued a press release disclosing a settlement with Imtrade Australia Pty Ltd. This The settlement came after FMC accused Imtrade of importing chlorantraniliprole without authorization. In its press release, FMC continued reiterated its aggressive posturing language stating that, "FMC will continue to vigorously enforce our intellectual property rights in Australia and worldwide."

95.     While this the Imtrade dispute ultimately did not result in litigation, on information and belief, FMC aggressively threatened such action. FMC's general counsel noted that there was "foreshadowed patent infringement litigation" with Imtrade over Imtrade's importation actions. Upon settlement, FMC's general counsel stated via a press release that "FMC will continue to vigorously enforce our intellectual property rights in Australia and worldwide."

96.     On information and belief, Imtrade and FMC resolved their dispute over chlorantraniliprole on undisclosed terms.

***FMC Corp. v. Zhejiang Yongtai Technology Co. Ltd.***

97.     In May 2022, FMC (and/or an FMC affiliated entity) filed suit for patent infringement against Zhejiang Yongtai Technology Co. Ltd. ("Yongtai") in an action styled as *FMC Agro Singapore Pte. Ltd v. Zhejiang Yongtai Technology Co. Ltd* filed in Ningbo Intermediate People's Court.

98.     On information and belief, FMC requested a pre-suit injunction against Yongtai to prevent Yongtai from engaging in any activity of offering to sell chlorantraniliprole until FMC's patent covering the chlorantraniliprole active ingredient has expired.

99.     FMC's aggressive tactics in China resulted in a rare issuance of a pre-suit injunction enjoining Yongtai from engaging in "any activity of offering to sell chlorantraniliprole until FMC's patent expires, including by doing so at trade fairs."

100.    The Yongtai action is yet another example of FMC's preemptory litigation strategy, seeking to preclude reasonable competition, even before any chlorantraniliprole product is approved and offered for sale to prospective customers.

101.    FMC coupled its aggressive strategy against Yongtai with a press release to further dissuade potential competitors. In May 2022, FMC publicized that it sought and obtained a very rare pre-suit

injunction against Yongtai from engaging in any activity of offering to sell chlorantraniliprole until FMC's patent covering the chlorantraniliprole active ingredient has expired. FMC stated:

> We will continue to protect our investment in researching, developing and commercializing chlorantraniliprole by vigorously enforcing our intellectual property rights in the United States and worldwide.

**FMC Corp. & Ors. v. Natco Pharma Ltd. (Delhi High Court Sept. 20, 2022)**

102. In May 2022, FMC (and/or an FMC affiliated entity) brought an action for patent infringement in India against Natco, which is captioned as *FMC Corp. & Ors. v. Natco Pharma Ltd.* (Delhi High Court Sept. 19, 2022). FMC asserted that Natco's process for making chlorantraniliprole infringed a patent owned by FMC pertaining to the method of manufacture.

103. Based on information made available in the *Natco* litigation, Natco's process for making chlorantraniliprole differed from the process claimed in FMC's asserted Indian patent. FMC nevertheless alleged infringement by invoking the doctrine of equivalents.

104. Based on public reporting, a judge of the Delhi High Court in India court ruled that FMC failed to prove that Natco's process infringed FMC's asserted process patent, as reported here: https://timesofindia.indiatimes.com/business/india-business/delhi-hc-bench-dismisses-fmc-corps-ctpr-patent-infringement-plea-against-natco/articleshow/96010718.cms.

105. In December 2022, FMC's appeal of that decision was dismissed by a two-judge panel of the Delhi High Court confirming that Natco's process does not infringe the asserted process patent. The Delhi High Court determined that FMC's claims that the process infringed under the doctrine of equivalents failed.

106. On information and belief, FMC has continued its dispute against Natco by filing additional actions for infringement against Natco in the District Court (Commercial), Chandigarh, based on reporting here: https://www.cnbctv18.com/india/natco-pharma-vs-fmc-corp-supreme-court-transfers-patent-infringement-suits-to-delhi-hc-19398052.htm. On information and belief, those actions were transferred from the Chandigarh District Court back to the Delhi High Court and remain pending.

*FMC Corp. & Ors. v. GSP Crop Science Private Ltd. (Delhi High Court Nov. 14, 2022)*

107.    In September 2022, FMC (and/or an FMC affiliated entity) brought an action for patent infringement in India against GSP Crop Science Private Ltd. ("GSP"), which is captioned as *FMC Corp. & Ors. v. GSP Crop Science Private Ltd.* (Delhi High Court 2022). FMC's Indian action against GSP was reported widely in the industry press, including in the following articles: https://news.ag-ropages.com/News/NewsDetail---44691.htm and https://agrospectrumindia.com/2022/11/23/delhi-high-court-greenlights-gsp-crop-sciences-chlorantraniliprole-launch.html.

108.    Based on public reports, FMC asserted that GSP's process for making chlorantraniliprole infringed one of FMC's patents directed to a method of making chlorantraniliprole. FMC sought an interim injunction against GSP that would have prevented GSP from making and selling its chlorantraniliprole.

109.    Based on publicly available information, the Delhi High Court denied FMC's request for an injunction and also ordered FMC to pay costs to GSP for its litigation conduct that was reported as FMC's "many material misrepresentations and suppressions."

*FMC v. Shandong Weifang Rainbow Chemical Co. Ltd.*

110.    On September 13, 2021, FMC issued a press release stating that the "Qingdao Intermediate Court in China ha[d] ruled in its favor in the chlorantraniliprole patent infringement suit against Shandong Weifang Rainbow Chemical Co. Ltd." According to FMC, the court found that Shandong Weifang Rainbow Chemical Co. Ltd. ("Rainbow") "infringed on FMC's composition of matter patent for the insecticidal active ingredient chlorantraniliprole and a key intermediate to manufacture chlorantraniliprole."

111.    The judgment against Rainbow included a permanent injunction that ordered Rainbow to "immediately stop manufacturing, selling, offering to sell and using chlorantraniliprole," as well as requiring Rainbow "to compensate FMC for related damages."

112.    FMC's general counsel stated in the press release that "[t]his decision strengthens FMC's confidence in protecting and enforcing its patents in China."

*FMC Corp. v. Sharda, LLC, 2:24-cv-02419 (E.D. Pa. filed June 4, 2024)*

113.    FMC's business strategy of aggressively and actively asserting its patents against potential

competitors is not limited to its chlorantraniliprole-related patents. FMC regularly uses similar tactics for its other pesticide products.

114. In June 2024, FMC instituted legal action against Sharda, LLC ("Sharda") in the Eastern District of Pennsylvania with respect to Sharda's EPA application to import, market, and sell a generic version of FMC's bifenthrin/zeta-cypermethrin combination product. The case was captioned as *FMC Corp. v. Sharda, LLC*, No. 2:24-cv-02419 (E.D. Pa. filed June 4, 2024).

115. FMC has been particularly aggressive in its action against Sharda. FMC sought a preliminary injunction against Sharda and asserted that Sharda's EPA approved label (which is required to be identical or substantially identical to the label of FMC's comparable product) infringes FMC copyrights in its label.

116. FMC has gone as far as seeking significant sanctions for Sharda's importation of products into the United States that were imported before the preliminary injunction issued. FMC sought attorney's fees, destruction of Sharda's imported product, and other remedies, despite that fact that Sharda had quarantined the shipment that occurred before the injunction ever issued.

117. While FMC's aggressive sanctions request was denied, FMC's attempt to have sanctions imposed on Sharda exemplifies FMC's hyper-aggressive litigious nature and its desire to impose as much financial and business strain as possible on competitors seeking to market competing products.

118. On August 28, 2024, FMC also issued a detailed press release to further highlight its enforcement efforts against Sharda. In that press release, FMC again stated in no uncertain terms that it is a company that is "unwavering" in its "dedicat[ion] to vigorously protect [its intellectual property] rights." FMC's executive vice president, general counsel, and secretary Michael Reilly stated:

> This ruling validates FMC's position on intellectual property rights and reinforces the importance of these rights as a cornerstone for innovation and progress in agriculture. FMC is dedicated to vigorously protecting our rights and ensuring that the fruits of our research and development efforts continue to deliver value and support sustainable agriculture globally. Our resolve to defend and enforce our intellectual property is unwavering, as it is essential for advancing technology that serves the greater good of farmers, consumers, investors, and our dedicated workforce.

119. In short, FMC's litigation tactics are well-known, and, whether successful or not, they have

22

a significant and adverse impact on competitors with considerably fewer resources than FMC. FMC's strategy has a significant chilling effect on competitors, including Atticus, and has a financially harmful effect on customers looking for more cost-efficient yet equally effective alternative pesticide products compared to FMC's expensive pesticide products.

120. Based on the information available, Atticus expects that FMC will continue its hyper-aggressive actions and conduct to discourage and delay competition in the chlorantraniliprole market, even if that competition is fair, reasonable, and non-infringing.

121. FMC's litigious conduct is highly disruptive to business, and it drains resources of competitors. FMC times its actions to inflict the greatest amount of harm on competitors like Atticus. Atticus should not be forced to operate in the shadows of FMC's patent-infringement accusations, which are attempts to impede and prevent competition in the chlorantraniliprole market.

**B. FMC's Statements to Investors**

122. FMC has communicated its business strategy of hyper-aggressive patent-enforcement efforts to its shareholders, for example, through statements made in SEC filings. FMC's aggressive patent enforcement strategy, which extends beyond just enforcement of composition of matter and process patents, has been laid out succinctly for the public consumption. And FMC has made clear its intent to continue to vigorously enforce its patents, including those directed to formulations.

123. For example, as recently as August 1, 2024, FMC's President Ronaldo Pereira, during FMC's Q2 2024 earnings webinar, touted the strength of FMC's chlorantraniliprole patent portfolio, including FMC's "strategies to maximize the diamides," including chlorantraniliprole. Mr. Pereira began by identifying key factors that have driven growth at FMC. He highlighted the "diamide franchise" as one of FMC's key growth areas, stating: "Growth of the diamides is supported by existing IP protection and our actions to transition to unique patented formulations. This is enabled by our extensive knowledge of the diamides and their target insect populations."

124. With respect to FMC's diamides business, Mr. Pereira further asserted:

Diamides have been a core part of our business since we launched FMC as a pure-play agricultural sciences company in 2018. In these almost-seven years, we have grown our partner base and expanded our geographic footprint. Through new product registrations we have introduced brand new patented formulations that allow us to enter new markets and crop segments.

125.    Mr. Pereira noted that the strength and resilience of FMC's diamides portfolio starts with composition-of-matter patents. He also noted, however, that those patents have largely expired.

126.    Mr. Pereira then identified "many other factors that support the strength of [FMC's] diamides." Those factors included FMC's patents directed to compositions of matter and manufacturing processes and data compensation that is required for generic competition.

127.    Mr. Pereira further noted that, as the composition-of-matter patents, process patents, and data compensation expires:

[W]e know that generics will come to the market, mostly with solo diamide products that mimic our original products. What they will find is that FMC has not been standing still. We have still been actively working to advance our diamide technology through new formulations: First, through the development of new—and in many cases patented—solo enhanced formulations . . . . These new enhanced solo formulations that we are now introducing in the market are often patented and include high-concentration and solid formulations, such as the large effervescent granule product we showcased at our November investor day.

*        *        *

Simply put, we are confident there is no impending revenue cliff for these key assets [including chlorantraniliprole]. There are layers of protection for [chlorantraniliprole]-based products making them an important growth platform for FMC for years to come.

1.    With respect to FMC's aggressive patent enforcement, Mr. Pereira also stated the following: "Our current patent estate is strong and will remain in place for some time. We are successfully defending our patents and will continue to enforce our IP."; "We are extending, and further protecting, the lifecycle of diamides through new formulations to ensure our portfolio remains convenient to growers, highly cost competitive and performance-differentiated . . . ."; and "These are the reasons why we believe that diamides will continue to be a meaningful contributor to FMC's growth throughout this decade and beyond."

128.    On October 31, 2023, FMC presented its Q3 2023 outlook for its diamide franchise and its intentions to vigorously enforce its intellectual property rights through litigation. The remarks were

24

presented by Mark Douglas, then-President and CEO of FMC Corporation.

129. Specifically, Mr. Douglas discussed FMC's diamide franchise and the importance of enforcement of FMC's patents. Mr. Douglas talked through portions of a detailed slide presentation that included FMC's lifecycle strategy for its diamide franchise.

130. As Mr. Douglas noted, a key pillar of FMC's strategy to protect its chlorantraniliprole market is defending and litigating any perceived infringement of FMC's patent rights.

131. Mr. Douglas stated that "FMC has a patent estate of over 1,000 granted and pending patents filed in over 75 countries for the diamides." He noted that "one addition from our last version of this slide, is the inclusion of patented mixtures and patent pending formulations that can extend patent coverage, once granted, to 2040 and beyond in some cases."

132. In order to protect its franchise, Mr. Douglas reiterated FMC's apparent "pillar" to vigorously enforce its patents against any perceived infringement when he stated in no uncertain terms: "FMC will continue to enforce our patents and we view any infringing party as a seller of illegal product." Since this presentation, FMC has continued to do just that, with its litigious conduct noted herein.

133. On August 4, 2021, FMC presented its Q2 2021 outlook for its diamide strategy. The remarks were presented by Mr. Douglas, then-President and CEO of FMC Corporation. Mr. Douglas reported on FMC's patent estate at the time, stating that "Rynaxypyr® active is covered by 21 patent families, with a total of 639 granted and pending patents."

134. Mr. Douglas also stated: "Rynaxypyr® and Cyazypyr® actives are complex molecules to produce. We have patented many of these steps, and several of these intermediate process patents run well past the expiration of the AI composition of matter patents." *Id*.

135. Mr. Douglas further touted how FMC's patents for chlorantraniliprole manufacturing create obstacles for competitors, stating that:

> The fastest route to market for a competitor to enter the market for generic Rynaxypyr®
> active or Cyazypyr® active is to register their product by relying on FMC's product data.
> To do so, they will also be required to demonstrate that their product has the same profile
> as FMC's Rynaxypyr® or Cyazypyr® actives. To meet these stringent regulatory

requirements for such difficult-to-manufacture molecules, the AI's will have to be made the way [FMC] [is] making it, which is protected by FMC process patents.

136.    Additionally, Mr. Douglas noted FMC's enforcement of its chlorantraniliprole patents, such as "a recent favorable injunction restraining Natco in India from making or selling any product containing Rynaxypyr® active." Mr. Douglas further expanded on FMC's enforcement history, stating that "[t]o date, we have enforced our patents and obtained preliminary injunctions or settlements against six infringers in India, and we have commenced litigation against four infringers in China."

137.    Being seemingly unsatisfied with only enforcement against competitors, Mr. Douglas further explained how FMC has received a "variety of other successful court decisions that support [its] strategy," such as "obtain[ing] an injunction against Brazilian regulators to respect [FMC's] Rynaxypyr® active data exclusivity, which will postpone action on all generic Rynaxypyr® active applications filed while [FMC] data exclusivity was still in force—effectively delaying their registration approval date by years."

138.    Additionally, Mr. Douglas stated:

[FMC] ha[s] also adopted a comprehensive regulatory advocacy strategy that includes notifying regulators about companies that do not have permission to produce. As a result of these efforts, multiple countries have decided not to accept any applications for registration of Rynaxypyr® active products prior to the AI's patent expiration, and others have decided to require additional data and proof of legitimate manufacturing rights in the source country as part of the application process.

139.    FMC has shown that it is not only willing to enforce its patents against competitors, but that it will also take action against regulators aimed at blocking a competitor's attempts to register a chlorantraniliprole product.

140.    FMC has also been sued by investors in a manner that, on information and belief, increases FMC's incentive to enforce its chlorantraniliprole patent estate against any perceived competitor. On November 9, 2023, as reported in a Law360 article published on November 13, 2023 (https://www.law360.com/articles/1765573/chemical-co-hit-with-investor-suit-over-patent-court-losses), FMC was "hit with an investor class action alleging that the company and its executives kept shareholders in the dark about a string of international patent court losses that enabled competitors to launch generic versions of its flagship product, causing damages to investors." The class action was filed as *Heeg v. FMC*

*Corp.*, No. 2:23-cv-04398 (E.D. Pa. filed Nov. 9, 2023). The class action alleged that FMC provided false and misleading information to investors about its diamide business, including false and misleading information about issues concerning patents and patent enforcement actions involving chlorantraniliprole.

141.     Another class action asserting similar allegations and claims was filed as *Employer-Local Teamsters Local Nos. 165 & 505 Health & Welfare Fund v. FMC Corp.*, No. 2:23-cv-4487 (E.D. Pa. filed Nov. 14, 2023).

142.     On information and belief, based on the two class actions, and in combination with FMC's previous statements and public representations about chlorantraniliprole and its patents that protect FMC's chlorantraniliprole business, FMC has an increased incentive to take any additional actions to forestall, delay, and/or interfere with any potential competitors in the chlorantraniliprole market, including Atticus.

**VI. Atticus's Products and Efforts to Market Chlorantraniliprole**

143.     Now that regulatory data exclusivity and patent protection for chlorantraniliprole as a compound have expired, generic competition in the chlorantraniliprole market is expected to increase. Generic competitors have filed EPA applications for chlorantraniliprole, and Atticus is one of those competitors. Atticus is working to develop the most comprehensive, unencumbered, and cost-effective portfolio of chlorantraniliprole pesticides in the agricultural and non-agricultural markets. In doing so, Atticus has undertaken extensive and substantial investments of time and resources to develop its own chlorantraniliprole TGAI and EUPs.

144.     For its chlorantraniliprole TGAI, Atticus has contracted with a third party who has developed a process of making chlorantraniliprole TGAI that does not infringe any U.S. patents owned by FMC.

145.     Atticus then applied to EPA for federal registration of its chlorantraniliprole TGAI. Atticus submitted its chlorantraniliprole TGAI application to EPA (with an EPA receipt date of March 20, 2023) for approval to distribute and sell Atticus's chlorantraniliprole active ingredient product. Atticus's technical registration covers chlorantraniliprole TGAI. EPA approved Atticus's application to register its chlorantraniliprole TGAI on March 20, 2024. Accordingly, as of March 20, 2024, Atticus is approved by EPA to distribute and sell its chlorantraniliprole TGAI in the United States.

146. As described below, Atticus has also applied to EPA to register each of its chlorantraniliprole EUPs identified herein.

147. Atticus was required to offer to pay its share of FMC/DuPont's data costs for obtaining regulatory approval for chlorantraniliprole when it filed its first application to register a chlorantraniliprole product. This payment is commonly referred to as "data compensation." Atticus made its required data-compensation offer to pay to FMC concurrently when it filed its EPA application for chlorantraniliprole TGAI.

148. In an effort to minimize any business disruptions with FMC and potential customers, Atticus has yet to import, sell, or offer for sale any chlorantraniliprole TGAI or any product containing chlorantraniliprole TGAI.

149. On November 12, 2024, Atticus informed FMC in writing (through counsel) that it does not expect to begin marketing its chlorantraniliprole products until after December 6, 2025, which is the date of expiration of FMC's key manufacturing process patent, U.S. Patent No. 7,528,260 ("the '260 patent"). Subsequent to that letter, Atticus further advised FMC that Atticus's plans may change in view of changing market conditions and that Atticus is working to enter the market as soon as Atticus receives the necessary regulatory approval, which Atticus reasonably expects is imminent within the next few months.

## VII.  Atticus's End-Use Products ("EUPs")

150. As of November 2024, Atticus has submitted ten applications, pursuant to FIFRA § 3(c)(7)(A), for EUP registrations of chlorantraniliprole-containing pesticide products to be distributed or sold in the United States. With respect to the chlorantraniliprole EUPs identified below, Atticus reasonably expects that EPA approval for its products is imminent and very likely within three months.

151. Consistent with FIFRA and EPA's rules, Atticus's EUPs are formulated to be identical or substantially similar to already registered chlorantraniliprole EUPs.

152. Upon receipt of EPA approval, Atticus will file applications to obtain state registrations for its EUPs, including each of the chlorantraniliprole EUPs identified herein.

28

**A. Atticus's Osaria™ Product (Identical/Substantially Similar to FMC's Altacor®)**

153.     Pursuant to FIFRA § 3(c)(7)(A), Atticus filed an application (with an EPA receipt date of March 20, 2023) to register to distribute and sell a chlorantraniliprole EUP that is a water-dispersible granule ("WDG") formulation containing 35% chlorantraniliprole, along with other inert ingredients.  Atticus intends to distribute and sell this formulation under the trade name Osaria™.

154.     Atticus applied for EPA registration of its Osaria™ insecticide as an "Identical/Substantially Similar" product.  Its Osaria™ product is an "identical/substantially similar product" compared to Altacor®, FMC's WDG chlorantraniliprole product.  Atticus has applied to register its Osaria™ product for identical/substantially similar uses as Altacor®.

155.     DuPont first obtained EPA approval for its Altacor® product on April 30, 2008.

156.     Atticus's Osaria™ product contains chlorantraniliprole TGAI registered by Atticus.

157.     As required, Atticus provided a confidential statement of formula ("CSF") to EPA that identifies the ingredients in Atticus's Osaria™ formulation.

158.     The identification of the inert ingredients of Atticus's Osaria™ product (as set forth in its CSF) are proprietary to Atticus and may include inert ingredients that are considered "proprietary" by third-party suppliers.

159.     Pursuant to EPA regulations, Atticus must make its Osaria™ product using Atticus's chlorantraniliprole and in accordance with the formulation submitted with Atticus's EPA applications for registration, as set forth in its CSF.

160.     Upon receiving EPA approval of Atticus's application for its Osaria™ product, Atticus can distribute and sell its Osaria™ product in the United States, subject to applicable state regulations.

161.     Based on communications with representatives from EPA, Atticus reasonably expects that EPA approval for its Osaria™ product is imminent and very likely within three months.  Atticus also expects that it will receive state registration in one or more states within approximately thirty days of EPA registration.

29

**B. Atticus's Asenra™ Product (Identical/Substantially Similar to Syngenta's Acelepryn®)**

162.     Pursuant to FIFRA § 3(c)(7)(A), Atticus filed an application (with an EPA receipt date of March 20, 2023) to register to distribute and sell a chlorantraniliprole EUP that is a suspension concentrate ("SC") formulation containing 18.4% chlorantraniliprole, along with other inert ingredients. Atticus intends to distribute and sell this formulation under the trade name Asenra™.

163.     Atticus applied for registration of its Asenra™ insecticide as an "Identical/Substantially Similar" product. Its Asenra™ product is an "identical/substantially similar product" compared to Acelepryn®, Syngenta's 18.4% SC chlorantraniliprole product. Atticus has applied to register its Asenra™ product for an identical/substantially similar use as the Acelepryn® product.

164.     DuPont first obtained approval for the Acelepryn® product on May 1, 2008.

165.     Atticus's Asenra™ product contains chlorantraniliprole TGAI registered by Atticus.

166.     As required, Atticus submitted a CSF to EPA that identifies all the ingredients in Atticus's Asenra™ formulation.

167.     The identities of the inert ingredients of Atticus's Asenra™ product (as set forth in its CSF) are proprietary to Atticus and may include ingredients that are considered "proprietary" by third-party suppliers.

168.     Pursuant to EPA regulation, Atticus must make its Asenra™ product using Atticus's chlorantraniliprole and in accordance with the formulation(s) submitted with Atticus's EPA applications for registration, as set forth in its CSF.

169.     Upon receiving EPA approval of Atticus's application for its Asenra™ product, Atticus can distribute and sell its Asenra™ product in the United States, subject to applicable state regulations.

170.     Based on communications with representatives from EPA, Atticus reasonably expects that EPA approval for its Asenra™ product is imminent and very likely within three months. Atticus also expects that it will receive state registration in one or more states within approximately thirty days of EPA registration.

### C. Atticus's Contigo™ Product (Identical/Substantially Similar to FMC's Coragen®)

171.    Pursuant to FIFRA § 3(c)(7)(A), Atticus filed an application (with an EPA receipt date of March 20, 2023) to register to distribute and sell a chlorantraniliprole EUP that is a suspension concentrate ("SC") formulation containing 18.4% chlorantraniliprole, along with other inert ingredients.  Atticus intends to distribute and sell this formulation under the trade name Contigo™.

172.    Atticus has applied for registration of its Contigo™ insecticide as an "Identical/Substantially Similar" product.  Its Contigo™ product is an "identical/substantially similar product" compared to Coragen®, which is FMC's 18.4% SC chlorantraniliprole product.  Atticus has applied to register Contigo™ for an identical/substantially similar use as FMC's Coragen® product.

173.    DuPont first obtained approval for the Coragen® product on May 1, 2008.

174.    Atticus's Contigo™ product contains chlorantraniliprole TGAI registered by Atticus.

175.    As required, Atticus provided EPA with a CSF that identifies all the ingredients in Atticus's Contigo™ formulation that, upon EPA approval, it intends to market and sell.

176.    The identities of the inert ingredients of Atticus's Contigo™ product (as set forth in its CSF) are proprietary to Atticus and may include ingredients that are considered "proprietary" by third-party suppliers.

177.    Pursuant to EPA regulations, Atticus must make its Contigo™ product using Atticus's chlorantraniliprole and in accordance with the formulation(s) submitted with Atticus's EPA applications for registration, as set forth in its CSF.

178.    Upon receiving EPA approval of Atticus's application for its Contigo™ product, Atticus can distribute and sell its Contigo™ product in the United States, subject to applicable state regulations.

179.    Based on communications with representatives from EPA, Atticus reasonably expects that EPA approval for its Contigo™ product is imminent and very likely within three months.  Atticus also expects that it will receive state registration in one or more states within approximately thirty days of EPA registration.

**D.  Atticus's Asenra MC™ Product (Identical/Substantially Similar to Syngenta's Calteryx®)**

180.    Pursuant to FIFRA § 3(c)(7)(A), Atticus filed an application (with an EPA receipt date of April 1, 2023) to register to sell a chlorantraniliprole formulation that is a manufacturing concentrate ("MC") formulation containing 12.5% chlorantraniliprole, along with other inert ingredients.  Atticus intends to distribute and sell this formulation under the trade name Asenra MC™.

181.    Atticus has applied for registration of its Asenra MC™ insecticide as an "Identical/Substantially Similar" product.  Its Asenra MC™ product is an "identical/substantially similar product" compared to Calteryx®, which is Syngenta's 12.5% MC chlorantraniliprole product.  Atticus has applied to register its Asenra MC™ product for an identical/substantially similar use as the Calteryx® product.

182.    DuPont first obtained approval for the Calteryx® 12.5% MC product on August 25, 2008.

183.    Atticus's Asenra MC™ product contains chlorantraniliprole TGAI registered by Atticus.

184.    As required, Atticus provided EPA with a CSF that identifies all the ingredients in Atticus's Asenra MC™ formulation that, upon EPA approval, it intends to distribute and sell.

185.    The identities of the inert ingredients of Atticus's Asenra MC™ (as set forth in its CSF) are proprietary to Atticus and may include ingredients that are considered "proprietary" by third-party suppliers.

186.    Pursuant to EPA regulations, Atticus must make its Asenra MC™ product using Atticus's chlorantraniliprole and in accordance with the formulation(s) submitted with Atticus's EPA applications for registration, as set forth in its CSF.

187.    Upon receiving EPA approval of Atticus's application for its Asenra MC™ product, Atticus can distribute and sell Asenra MC™ in the United States, subject to applicable state regulations.

188.    Based on its communications with EPA representatives, Atticus reasonably expects that EPA approval for its Asenra MC™ product is imminent and very likely within three months.  Atticus also expects that it will receive state registration in one or more states within approximately thirty days of EPA registration.

### E. Atticus's Pixovere™ Product (Identical/Substantially Similar FMC's Prevathon®)

189. Pursuant to FIFRA § 3(c)(7)(A), Atticus filed an application (with an EPA receipt date of March 20, 2023) to register to sell a chlorantraniliprole EUP that is a flowable concentrate ("FC") formulation containing 5% chlorantraniliprole, along with other inert ingredients. Atticus intends to distribute and sell this formulation under the trade name Pixovere™.

190. Atticus has applied for registration of its Pixovere™ insecticide as an "Identical/Substantially Similar" product. Its Pixovere™ product is an "identical/substantially similar product" compared to Prevathon®, which is FMC's 5% FC chlorantraniliprole product. Atticus has applied to register its Pixovere™ product for an identical/substantially similar use as Prevathon®.

191. DuPont first obtained approval for the Prevathon® product on March 1, 2011.

192. Atticus's Pixovere™ product contains chlorantraniliprole technical registered by Atticus.

193. As required, Atticus provided EPA with a CSF that identifies all the ingredients in Atticus's Pixovere™ formulation that, upon EPA approval, it intends to distribute and sell.

194. The identities of the inert ingredients of Atticus's Pixovere™ (as set forth in its CSF) are proprietary to Atticus and may include ingredients that are considered "proprietary" by third-party suppliers.

195. Pursuant to EPA regulations, Atticus must make its Pixovere™ product using Atticus's chlorantraniliprole and in accordance with the formulation(s) submitted with Atticus's EPA applications for registration, as set forth in its CSF.

196. Upon receiving EPA approval of Atticus's application for its Pixovere™ product, Atticus can distribute and sell Pixovere™ in the United States, subject to applicable state regulations.

197. Based on communications with representatives from EPA, Atticus reasonably expects that EPA approval for its Pixovere™ product is imminent and very likely within three months. Atticus also expects that it will receive state registration in one or more states within approximately thirty days of EPA registration.

**F. Atticus's Kylix™ Product (Identical/Substantially Similar to FMC's Vantacor®)**

198.     Pursuant to FIFRA § 3(c)(7)(A), Atticus filed an application (with an EPA receipt date of August 23, 2023) to register to sell a chlorantraniliprole EUP that is a SC formulation containing 47.85% chlorantraniliprole, along with other inert ingredients. Atticus intends to distribute and sell this formulation under the trade name Kylix™.

199.     Atticus has applied for registration of its Kylix™ insecticide as a "Identical/Substantially Similar" product. Kylix™ is an "identical/substantially similar product" compared to Vantacor®, FMC's 47.85% SC chlorantraniliprole product. Atticus has applied to register its Kylix™ product for an identical/substantially similar use as Vantacor®.

200.     FMC first obtained approval for the Vantacor® product on September 25, 2020.

201.     Atticus's Kylix™ product contains chlorantraniliprole technical registered by Atticus.

202.     As required, Atticus submitted a CSF to EPA that identifies all the ingredients in Atticus's Kylix™ formulation.

203.     The identities of the inert ingredients of Atticus's Kylix™ product (as set forth in its CSF) are proprietary to Atticus and may include ingredients that are considered "proprietary" by third-party suppliers.

204.     Pursuant to EPA regulation, Atticus must make its Kylix™ product using Atticus's chlorantraniliprole TGAI and in accordance with the formulation(s) submitted with Atticus's EPA applications for registration, as set forth in its CSF.

205.     Upon receiving EPA approval of Atticus's application for its Kylix™ product, Atticus can distribute and sell Kylix™ in the United States, subject to applicable state regulations.

206.     Based on communications with representatives from EPA, Atticus reasonably expects that EPA approval for its Kylix™ product is imminent and very likely within three months. Atticus also expects that it will receive state registration in one or more states within approximately thirty days of EPA registration.

### G. Atticus's Osaria OPT™ Product (Identical/Substantially Similar to FMC's Altacor eVo®)

207.    Pursuant to FIFRA § 3(c)(7)(A), Atticus filed an application (with an EPA receipt date of August 23, 2023) to register to sell a chlorantraniliprole EUP that is a WDG formulation containing 70% chlorantraniliprole, along with other inert ingredients.  Atticus intends to distribute and sell this formulation under the trade name Osaria OPT™.

208.    Atticus has applied for registration of its Osaria OPT™ insecticide as an "Identical/Substantially Similar" product.  Its Osaria OPT™ product is an "identical/substantially similar product" compared to Altacor eVo®, FMC's 70% WDG chlorantraniliprole product.  Atticus has applied to register its Osaria OPT™ product for an identical/substantially similar use as Altacor eVo®.

209.    FMC first obtained approval for the Altacor eVo® product on May 17, 2022.

210.    Atticus's Osaria OPT™ product contains chlorantraniliprole TGAI registered by Atticus.

211.    As required, Atticus provided EPA with CSF that identifies all the ingredients in Atticus's Osaria OPT™ formulation that, upon EPA approval, it intends to distribute and sell.

212.    The identities of the inert ingredients of Atticus's Osaria OPT™ product (as set forth in its CSF) are proprietary to Atticus and may include ingredients that are considered "proprietary" by third-party suppliers.

213.    Pursuant to EPA regulations, Atticus must make its Osaria OPT™ product using Atticus's chlorantraniliprole and in accordance with the formulation(s) submitted with Atticus's EPA applications for registration, as set forth in its CSF.

214.    Upon receiving EPA approval of Atticus's application for its Osaria OPT™ product, Atticus can distribute and sell its Osaria OPT™ product in the United States, subject to applicable state regulations.

215.    Based on communications with representatives from EPA, Atticus reasonably expects that EPA approval for its Osaria OPT™ product is imminent and very likely within three months.  Atticus also expects that it will receive state registration in one or more states within approximately thirty days of EPA registration.

**H. Atticus's Asenra G™ Product (Identical/Substantially Similar to Syngenta's Acelepryn G®)**

216. Pursuant to FIFRA § 3(c)(7)(A), Atticus filed an application (with an EPA receipt date of March 20, 2023) to register to sell a chlorantraniliprole EUP that is a granule formulation containing 0.2% chlorantraniliprole, along with other inert ingredients. Atticus intends to distribute and sell this formulation under the trade name Asenra G™.

217. Atticus has applied for registration of its Asenra G™ insecticide as a "Identical/Substantially Similar" product. Its Asenra G™ product is an "identical/substantially similar product" compared to Acelepryn G®, Syngenta's 0.2% chlorantraniliprole granule product. Atticus has applied to register its Asenra G™ product for an identical/substantially similar use as Acelepryn G®.

218. DuPont first obtained approval for the Acelepryn G® product on August 26, 2008.

219. Atticus's Asenra G™ product contains chlorantraniliprole TGAI registered by Atticus.

220. As required, Atticus submitted a CSF to the EPA that identifies all the ingredients in Atticus's Asenra G™ formulation.

221. The identities of the inert ingredients of Atticus's Asenra G™ product (as set forth in its CSF) are proprietary to Atticus and may include ingredients that are considered "proprietary" by third-party suppliers.

222. Pursuant to EPA regulation, Atticus must make its Asenra G™ product using Atticus's chlorantraniliprole and in accordance with the formulation(s) submitted with Atticus's EPA applications for registration, as set forth in its CSF.

223. Upon receiving EPA approval of Atticus's application for its Asenra G™ product, Atticus can distribute and sell its Asenra G™ product in the United States, subject to applicable state regulations.

224. Based on communications with representatives from EPA, Atticus reasonably expects that EPA approval for its Asenra G™ product is imminent and very likely within three months. Atticus also expects that it will receive state registration in one or more states within approximately thirty days of EPA registration.

## VIII.  FMC's Patents Relating to Chlorantraniliprole

225.     As part of one of its pillars to protect its diamide business, FMC has obtained the rights to numerous patents that cover chlorantraniliprole formulations and/or products.  Atticus believes that each of the below-identified FMC patents potentially impacts Atticus's chlorantraniliprole EUPs.

### A.  U.S. Patent No. 8,530,382

226.     The '382 patent is titled "Anthranilic Diamide Compositions for Propagule Coating."  Ex. 1 at 1.

227.     Based on its cover page, the '382 patent issued on September 10, 2013.  Based on current USPTO assignment records, the '382 patent is assigned to FMC.

228.     On information and belief, the '382 patent expires on September 3, 2030.

229.     Exemplary independent claim 1 of the '382 patent reads as follows:

1. An insecticidal composition comprising by weight based on the total weight of the composition:

(a) from about 9 to about 91% of one or more anthranilic diamide insecticides selected from Formula 1, N-oxides, and salts thereof, [wherein Formula I includes and covers chlorantraniliprole];

and

(b) from about 9 to about 91% of a nonionic ethylene oxide-propylene oxide block copolymer component selected from poloxamers, reverse poloxamers, poloxamines and reverse poloxamines, having a water solubility of at least about 5% by weight at 20° C, a hydrophilic-lipophilic balance value of at least or about 5 and an average molecular weight ranging from about 3000 to about 20000 daltons;

wherein the ratio of component (b) to component (a) is about 1:5 to about 10:1 by weight.

*Id.* at col. 47-48.

230.     All other claims of the '382 patent depend directly or indirectly from claim 1, and therefore all other claims require "from about 9 to about 91% of a nonionic ethylene oxide-propylene oxide block copolymer component selected from poloxamers, reverse poloxamers, poloxamines and reverse poloxamines," as set forth in claim 1.  *Id.* at col. 48.

37

**B. U.S. Patent No. 8,709,513**

231.     The '513 patent is titled "Liquid Formulations of Carboxamide Arthropodicides."  Ex. 2 at 1.

232.     Based on its cover page, the '513 patent issued on April 29, 2014.  Based on current USPTO assignment records, the '513 patent is assigned to FMC.

233.     On information and belief, the '513 patent expires on February 22, 2029.

234.     Exemplary independent claim 1 of the '513 patent reads as follows:

1. An arthropodicidal suspension concentrate composition comprising by weight based on the total weight of the composition:

(a) from 5 to about 30% of one or more carboxamide arthropodicides that are solid at room temperature selected from anthranilamides of Formula 1, N-oxides, and salts thereof,

(b) from 0 to about 20% of one or more biologically active agents other than the carbox-amide arthropodicides;

(c) from about 20 to about 50% of water;

(d) from about 20 to about 60% of one or more water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed; and

(e) from about 3 to about 20% of a surfactant component comprising from about 1 to about 5% of (e1) a surfactant having a dispersing property, from about 2 to about 7% of (e2) a surfactant having an emulsifying property comprising one or more surfactants selected from anionic surfactants and non-ionic surfactants, and (e3) one or more surfactants having a wetting property, wherein (e3) does not exceed about 5% of the composition by weight.

*Id.* at col. 43-44.

235.     All other claims of the '513 patent depend directly or indirectly from claim 1, and therefore all other claims require "from about 20 to about 60% of one or more water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed." *Id.* at col. 44.

**C. U.S. Patent No. 9,332,756**

236.     The '756 patent is titled "Liquid Formulations of Carboxamide Arthropodicides."  Ex. 3 at 1.

237.     Based on its cover page, the '756 patent issued on May 10, 2016.  Based on current USPTO assignment records, the '756 patent is assigned to FMC and FMC IP Technology GmbH.

238.    On information and belief, the '756 patent expires on May 23, 2030.

239.    Exemplary independent claim 1 of the '756 patent reads as follows

1. An arthropodicidal suspension concentrate composition comprising by weight based on the total weight of the composition:

(a) about 0.1 to about 40% of at least one carboxamide arthropodicide that is solid at room temperature;

(b) 0 to about 20% of at least one biologically active agent other than the at least one carboxamide arthropodicide that is solid at room temperature;

(c) about 30 to about 95% of at least one water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed;

(d) about 2 to about 50% of at least one emulsifier comprising a mixture of a dodecylbenzenesulfonate and an ethoxylated sorbitol hexaoleate;

(e) about 0.01 to about 10% of a silica thickener comprising fumed silica;

(f) about 0.1 to about 10% of water; and

(g) about 0.001 to about 5% of citric acid.

*Id.* at cols. 35-38.

240.    All other claims of the '756 patent depend directly or indirectly from claim 1, and therefore all other claims require "about 30 to about 95% of at least one water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed; about 2 to about 50% of at least one emulsifier comprising a mixture of a dodecylbenzenesulfonate and an ethoxylated sorbitol hexaoleate," and "about 0.001 to about 5% of citric acid." *Id.* at col. 36.

**D.  U.S. Patent No. 9,826,737**

241.    The '737 patent is titled "Solid Formulations of Carboxamide Arthropodicides." Ex. 4 at 1.

242.    Based on its cover page, the '737 patent issued on November 28, 2017.  Based on current USPTO assignment records, the '737 patent is assigned to FMC.

243.    On information and belief, the '737 patent expires on June 20, 2028.

244.    Independent claim 1 of the '737 patent reads as follows

1. A solid arthropodicide composition comprising by weight

39

(a) from 0.3 to 100% of a particulate component comprising porous particles of a solid carrier selected from the group consisting of silicas and silicates of magnesium, calcium, aluminum and mixtures thereof infiltrated with a mixture comprising (i) an anthranilamide of Formula 1, and (ii) a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl) polyglycoside; an ethylene oxide-propylene oxide block copolymer consisting of 11 ethylene oxide-derived units, then 16 propylene oxide block copolymers and then 11 ethylene oxide-derived units; and polyoxyethylene (20) sorbitan monolaurate, wherein the weight ratio of the surfactant constituent (ii) to the anthranilamide of Formula 1 (i) ranges from 1:2 to 2:1.

*Id.* at cols. 39-40.

245.    All other claims of the '737 patent depend directly or indirectly from claim 1, and therefore all other claims require "a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate." *Id.* at col. 40.

**E.    FMC Patents Directed to Methods of Making Chlorantraniliprole**

246.    The '260 patent, titled "Method for Preparing N-phenylpyrazole-1-carboxamides," discloses and claims a particular method of manufacture of diamide compounds, including chlorantraniliprole.

247.    The application for the '260 patent was filed on December 6, 2005.  The '260 patent issued on May 5, 2009.

248.    On information and belief, the '260 patent expires on December 6, 2025.

249.    The process for making Atticus's chlorantraniliprole TGAI does not infringe the '260 patent or any other U.S. patents owned by FMC.  Based on its assessment, Atticus currently can make, use, sell, offer to sell, and/or import its chlorantraniliprole TGAI (subject to any regulatory approval) without any risk of infringing the '260 patent.

250.    Atticus has sourced chlorantraniliprole from a third-party supplier that uses a process to make the chlorantraniliprole TGAI that does not infringe any valid claims of the '260 patent.  Atticus's supplier was identified in Atticus's EPA application to register its chlorantraniliprole TGAI.  As noted above, Atticus's chlorantraniliprole TGAI is now registered with EPA.

251.    Atticus intends to make, use, sell, offer to sell, and/or import its chlorantraniliprole EUPs as identified above (subject to regulatory approval) before the expiration of the above-identified FMC

patents directed to chlorantraniliprole pesticidal formulations.

IX. **Atticus's Efforts to Resolve Disputes in Advance of Its Marketing of Its Chlorantraniliprole Products**

252.    Atticus has at all times worked to develop chlorantraniliprole products that do not infringe any valid U.S. patents.  Atticus has further made all diligent efforts to work with FMC to confirm that Atticus's chlorantraniliprole products do not and will not infringe any valid FMC patents. Atticus's efforts to address any of FMC's potential infringement contentions lodged by FMC are done to avoid unnecessary litigation and to minimize burdens and potential disruptions to customers.

253.    On October 17, 2023, Atticus business representatives met with FMC business representatives to discuss business opportunities concerning chlorantraniliprole.  The meeting was attended by representatives of Atticus (Randy Canady and Kevin Howard) and by FMC business representatives (Darren Dillenbeck, then-President of FMC, USA; Julio Negreli, then-US Marketing Director; Neil Young, Insect and Biological Portfolio Manager; Tim McMenamin, Senior Manager in Business Development; Adam Manwarren, then-Business Development Manager; and Brett Kanoff, then-Senior Finance Manager.).

254.    At that initial meeting, Mr. Canady presented detailed information on Atticus's chlorantraniliprole pending registrations, including Atticus's brand names, the product strengths, and a correlation to FMC's branded chlorantraniliprole products.

255.    Based on that initial meeting, Atticus was left with the understanding that any manufacturer of chlorantraniliprole infringes FMC's patents, unless the manufacturer obtains a patent license from FMC.

256.    Shortly after that meeting, FMC opted to involve outside litigation counsel.  On November 3, 2023, FMC, through outside litigation counsel, sent a letter to Atticus's CEO Randy Canady concerning Atticus's chlorantraniliprole registration efforts.  In that letter, FMC litigation counsel identified FMC certain patents that are directed to chlorantraniliprole.  FMC identified the '836 patent as covering chlorantraniliprole but having already expired.  FMC then stated: "FMC believes that Atticus's past or future activities in connection with Atticus's chlorantraniliprole product may infringe one or more of [the identified] patents owned by FMC."  FMC identified sixteen U.S. patents that, according to FMC, cover

chlorantraniliprole or some aspect of its manufacture or use.

257. FMC went on to state: "Similarly, FMC's growing patent portfolio in this area also covers various mixtures and formulations of chlorantraniliprole. Therefore, additional patents not identified above may also be implicated by Atticus's future chlorantraniliprole products." FMC did not identify the "additional patents."

258. In the November 3 letter, FMC further demanded that Atticus provide detailed information about all of its activities pertaining to chlorantraniliprole, including "at a minimum," (1) identification of all shipments of chlorantraniliprole received by Atticus in the United States; (2) identification of the "full reaction pathway" for any chlorantraniliprole as well as the name of the manufacturer; and (3) a 10-gram sample of chlorantraniliprole for analysis by FMC. The letter demanded that Atticus provide the requested information by November 17, 2023.

259. On November 12, 2023, Atticus promptly responded to FMC's initial demand letter. Counsel for Atticus conveyed Atticus's intent to "engage in this matter proactively and amicably and to facilitate the best outcome for mutual benefit." As an initial matter, Atticus noted that FMC's November 3 letter was not confidential and was not subject to any confidentiality obligations. Atticus next confirmed that it had not imported, tested, or otherwise used any chlorantraniliprole active ingredient in the United States before December 1, 2022. Atticus further confirmed that it had not "authorized or requested the manufacture, importation, use, sale, or offer for sale of any chlorantraniliprole active ingredient or EUPs in the United States."

260. Atticus further noted that FMC failed to identify any additional "'approved and pending' 'formulation and mixture patents'" that FMC contends extended patent protection through an unspecified date.

261. Atticus therefore reasonably requested that FMC provide "a complete list of U.S. patents and patent applications that FMC contends cover the sale and use of the following products: Rynaxypyr® active, Altacor®, Coragen®, Elevest®, Prevathon®, and Vantacor®." Atticus agreed to engage with FMC to address FMC's concerns about Atticus's supplier's process for making chlorantraniliprole, under an

42

appropriate confidentiality agreement. Atticus and FMC subsequently negotiated and entered into a confidentiality agreement on December 18, 2023, which contemplated Atticus sharing confidential information about the process for making Atticus's chlorantraniliprole as well as information about Atticus's chlorantraniliprole products.

262.     On February 7, 2024, Atticus confidentially disclosed details of its supplier's process for manufacturing its chlorantraniliprole TGAI. The parties subsequently exchanged emails concerning the chlorantraniliprole process used to make Atticus's chlorantraniliprole TGAI and Atticus's position that the process does not infringe FMC's '260 patent, as well as Atticus's desire to detail how its chlorantraniliprole EUPs do not infringe any FMC patent.

263.     On March 25, 2024, counsel for Atticus again requested that FMC provide a complete list of U.S. patents and applications that FMC contends cover the sale and use of the following products: Rynaxypyr®, Altacor®, Coragen®, Elevest®, Prevathon®, and Vantacor®. Atticus requested the information because it respects valid intellectual property rights and diligently works to avoid unnecessary litigation and expense. Atticus provided a detailed explanation as to why FMC's patents are irrelevant to Atticus's chlorantraniliprole product(s).

264.     On May 3, 2024, counsel for Atticus again sought more information from FMC concerning the patents and applications that FMC contended covered its products. Atticus stated the reasons for its request and also offered to disclose Atticus's formulations that are the subject of its pending EPA applications for Atticus's chlorantraniliprole EUPs.

265.     On October 7, 2024, Atticus made another attempt to engage FMC on the issue of the purported "additional patents" that FMC contends could be infringed by Atticus's chlorantraniliprole products. Atticus did not receive any assurance from FMC about non-infringement of the "additional patents."

266.     Atticus business representatives continued to engage with FMC business representatives. On September 9, 2024, Mr. Canady wrote to Mr. Dillenbeck and Matt Hancock (Business Development and Licensing at FMC) to provide an update on Atticus's chlorantraniliprole EPA applications with respect to the manufacturing source.

267.     On November 11, 2024, Atticus business representatives again met with FMC business representatives, including Mr. Dillenbeck, to further discuss potential business opportunities for chlorantraniliprole and Atticus's intent to begin selling its chlorantraniliprole EUPs. Based on that meeting, Atticus was left with the impression that FMC would vigorously defend its asserted patent rights, which would likely include suing Atticus if it were to proceed to launch its chlorantraniliprole products.

268.     On November 27, 2024, Atticus through counsel again stated that Atticus "is actively working to offer the most comprehensive and unencumbered [chlorantraniliprole] product portfolio, which means all commercially registered product offers in Atticus's Ag (crop), EcoCore (non-crop), and seed-treatment businesses."

269.     Most recently, on December 18, 2024, Atticus informed FMC by letter that FMC has refused to provide any assurance, let alone reasonable assurance, that FMC would not sue Atticus for its intended sale and offer to sell its [chlorantraniliprole] product portfolio, "which means all commercially registered product offers in Atticus's Ag (crop), EcoCore (non-crop), and seed-treatment businesses."

270.     FMC's refusal to reach a resolution with Atticus one the disputes about chlorantraniliprole leaves Atticus with the eminently reasonable impression that, once Atticus begins making, using, selling, offering to sell, or importing its EUP chlorantraniliprole products, FMC will then sue Atticus for infringement based on FMC's patents that are the subject of this action.

## COUNT I
### (Declaratory Judgment of Non-Infringement of the '382 Patent
### for Atticus's Osaria™ Product)

271.     Atticus repeats and realleges Paragraphs 1-270 of this Complaint as if fully set forth herein.

272.     In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '382 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Osaria™ product.

273.     Atticus has taken concrete steps to prepare to distribute and sell its Osaria™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other

regulatory provisions in order to distribute and sell its Osaria™ product, such as the submission of the CSF for its Osaria™ product, and developing marketing materials for Osaria™.

274.     Atticus expects to receive EPA approval for its Osaria™ product within three months of the filing of this action, and certainly long before the expiration of the '382 patent.  Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

275.     Upon EPA approval and any state approval for its Osaria™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell Osaria™ within the United States.

276.     FMC has not offered a covenant that it will not sue Atticus for infringing the '382 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Osaria™ product within the United States.

277.     Atticus's Osaria™ product does not infringe any claim of the '382 patent, either literally or under the doctrine of equivalents.

278.     In particular, every claim of the '382 patent requires "(b) from about 9 to about 91% of a nonionic ethylene oxide-propylene oxide block copolymer component selected from poloxamers, reverse poloxamers, poloxamines and reverse poloxamines, having a water solubility of at least about 5% by weight at 20° C, a hydrophilic-lipophilic balance value of at least or about 5 and an average molecular weight ranging from about 3000 to about 20000 daltons."  Ex. 1, cols. 47-48.

279.     Atticus's Osaria™ product does not meet all claim limitations, for example because it does not contain a nonionic ethylene oxide-propylene oxide block copolymer component selected from polox-amers, reverse poloxamers, poloxamines and reverse poloxamines, as required by every claim of the '382 patent.  Thus, for at least this reason, Atticus's Osaria™ product does not meet each and every limitation of any claim of the '382 patent and therefore does not literally infringe the '382 patent.

280.     Atticus's Osaria™ product does not contain an ingredient that could be deemed an equiv-alent to "poloxamers, reverse poloxamers, poloxamines and reverse poloxamines."  Specifically, no com-ponent in Atticus's Osaria™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the nonionic ethylene oxide-propylene oxide block

45

copolymer component as claimed in the '382 patent.  Furthermore, there are substantial differences between (a) each ingredient of Atticus's Osaria™ product and (b) the "a nonionic ethylene oxide-propylene oxide block copolymer component" limitation required for each claim of the '382 patent.

281.    Atticus seeks a declaration that its Osaria™ product does not and will not infringe any claim of the '382 patent, either literally or under the doctrine of equivalents.

**COUNT II**
**(Declaratory Judgment of Non-Infringement of the**
**'513 Patent for Atticus's Osaria™)**

282.    Atticus repeats and realleges Paragraphs 1-281 of this Complaint as if fully set forth herein.

283.    In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '513 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Osaria™ product.

284.    Atticus has taken concrete steps to prepare to distribute and sell its Osaria™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell Osaria™, such as the submission of the CSF for its Osaria™ product, and developing marketing materials for its Osaria™ product.

285.    Atticus expects to receive EPA approval for its Osaria™ product within three months of the filing of this action, and certainly long before the expiration of the '513 patent.  Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

286.    Upon EPA approval and any state approval for its Osaria™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Osaria™ product within the United States.

287.    FMC not offered a covenant that it will not sue Atticus for infringing the '513 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Osaria™ product within the United States.

288.    Atticus's Osaria™ product does not infringe any claim of the '513 patent, either literally or under the doctrine of equivalents.

46

289. In particular, every claim of the '513 patent requires "(d) from about 20 to about 60% of one or more water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed." Ex. 2 at col. 43.

290. Atticus's Osaria™ product does not meet all claim limitations, for example because it does not contain a water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed, as required by every claim of the '513 patent. Thus, for at least this reason, Atticus's Osaria™ product does not meet each and every limitation of any claim of the '513 patent and therefore does not literally infringe the '513 patent.

291. Atticus's Osaria™ product does not contain an ingredient that could be deemed an equivalent to the claimed "methylated seed oil." Specifically, no component in Atticus's Osaria™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the methylated seed oil claimed in the '513 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Osaria™ product and (b) the "water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed" limitation required for each claim of the '513 patent.

292. Atticus seeks a declaration that its Osaria™ product does not and will not infringe any claim of the '513 patent, either literally or under the doctrine of equivalents.

### COUNT III
### (Declaratory Judgment of Non-Infringement of the
### '756 Patent for Atticus's Osaria™ Product)

293. Atticus repeats and realleges Paragraphs 1-292 of this Complaint as if fully set forth herein.

294. In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '756 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Osaria™ product.

295. Atticus has taken concrete steps to prepare to distribute and sell its Osaria™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other

47

regulatory provisions in order to distribute and sell its Osaria™ product, such as the submission of the CSF for its Osaria™ product, and developing marketing materials for its Osaria™ product.

296.     Atticus expects to receive EPA approval for its Osaria™ product within three months of the filing of this action, and certainly long before the expiration of the '756 patent. Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

297.     Upon EPA approval and any state approval for its Osaria™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Osaria™ product within the United States.

298.     FMC not offered a covenant that it will not sue Atticus for infringing the '756 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Osaria™ product within the United States.

299.     Atticus's Osaria™ product does not infringe any claim of the '756 patent, either literally or under the doctrine of equivalents.

300.     In particular, every claim of the '756 patent requires "(c) about 30 to about 95% of at least one water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed." Ex. 3 at col. 35.

301.     Atticus's Osaria™ product does not meet all claim limitations, for example because it does not contain a "water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed," as required by every claim of the '756 patent. Thus, for at least this reason, Atticus's Osaria™ product does not meet each and every limitation of any claim of the '756 patent and therefore does not literally infringe the '756 patent.

302.     Atticus's Osaria™ product does not contain an ingredient that could be deemed an equivalent to the claimed "methylated seed oil." Specifically, no component in Atticus's Osaria™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the methylated seed oil claimed in the '756 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Osaria™ product and (b) the "water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed" limitation

48

required for each claim of the '756 patent.

303.     Atticus seeks a declaration that its Osaria™ product does not and will not infringe any claim of the '756 patent, either literally or under the doctrine of equivalents.

**COUNT IV**
**(Declaratory Judgment of Non-Infringement of the**
**'737 Patent for Atticus's Osaria™)**

304.     Atticus repeats and realleges Paragraphs 1-303 of this Complaint as if fully set forth herein.

305.     In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '737 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Osaria™ product.

306.     Atticus has taken concrete steps to prepare to distribute and sell its Osaria™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Osaria™ product, such as the submission of the CSF as for its Osaria™ product, and developing marketing materials for its Osaria™ product.

307.     Atticus expects to receive EPA approval for its Osaria™ product within three months of the filing of this action, and certainly long before the expiration of the '737 patent. Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

308.     Upon EPA approval and any state approval for its Osaria™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Osaria™ product within the United States.

309.     FMC not provided a covenant that it will not sue Atticus for infringing the '737 patent, once Atticus begins making, using, selling, offering to sell, and/or importing Osaria™ within the United States.

310.     Atticus's Osaria™ product does not infringe any claim of the '737 patent, either literally or under the doctrine of equivalents.

311.     In particular, every claim of the '737 patent requires "(ii) a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-

49

$C_{16}$ alkyl)polyglycoside; an ethylene oxide-propylene oxide block copolymer consisting of 11 ethylene oxide-derived units, then 16 propylene oxide block copolymers and then 11 ethylene oxide-derived units; and polyoxyethylene (20) sorbitan monolaurate." Ex. 4 at col. 40.

312.   Atticus's Osaria™ does not meet all claim limitations, for example because it does not contain "a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate," as required by every claim of the '737 patent.  Thus, for at least this reason, Atticus's Osaria™ product does not meet each and every limitation of any claim of the '737 patent and therefore does not literally infringe the '737 patent.

313.   Atticus's Osaria™ product does not contain an ingredient that could be deemed an equivalent to "a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate."  Specifically, no component in Atticus's Osaria™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the surfactant claimed in the '737 patent.  Furthermore, there are substantial differences between (a) each ingredient of Atticus's Osaria™ product and (b) the "surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate" limitation required for each claim of the '737 patent.

314.   Atticus seeks a declaration that its Osaria™ product does not and will not infringe any claim of the '737 patent, either literally or under the doctrine of equivalents.

## COUNT V
## (Declaratory Judgment of Non-Infringement of the '382 Patent
## for Atticus's Asenra™)

315.   Atticus repeats and realleges Paragraphs 1-314 of this Complaint as if fully set forth herein.

316.   In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '382 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Asenra™ product.

317.     Atticus has taken concrete steps to prepare to distribute and sell its Asenra™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Asenra™ product, such as the submission of the CSF for its Asenra™ product, and developing marketing materials for its Asenra™ product.

318.     Atticus expects to receive EPA approval for its Asenra™ product within three months of the filing of this action, and certainly long before the expiration of the '382 patent. Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

319.     Upon EPA approval and any state approval for its Asenra™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Asenra™ product within the United States.

320.     FMC has not offered a covenant that it will not sue Atticus for infringing the '382 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Asenra™ product within the United States.

321.     Atticus's Asenra™ product does not infringe any claim of the '382 patent, either literally or under the doctrine of equivalents.

322.     In particular, every claim of the '382 patent requires "(b) from about 9 to about 91% of a nonionic ethylene oxide-propylene oxide block copolymer component selected from poloxamers, reverse poloxamers, poloxamines and reverse poloxamines, having a water solubility of at least about 5% by weight at 20° C, a hydrophilic-lipophilic balance value of at least or about 5 and an average molecular weight ranging from about 3000 to about 20000 daltons." Ex. 1 at cols. 47-48.

323.     Atticus's Asenra™ does not meet all claim limitations, for example because it does not contain a nonionic ethylene oxide-propylene oxide block copolymer component selected from poloxamers, reverse poloxamers, poloxamines and reverse poloxamines, as required by every claim of the '382 patent. Thus, for at least this reason, Atticus's Asenra™ product does not meet each and every limitation of any claim of the '382 patent and therefore does not literally infringe the '382 patent.

51

324.    Atticus's Asenra™ product does not contain an ingredient that could be deemed an equivalent to "poloxamers, reverse poloxamers, poloxamines and reverse poloxamines." Specifically, no component in Atticus's Asenra™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the nonionic ethylene oxide-propylene oxide block copolymer component as claimed in the '382 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Asenra™ product and (b) the "a nonionic ethylene oxide-propylene oxide block copolymer component" limitation required for each claim of the '382 patent.

325.    Atticus seeks a declaration that its Asenra™ product does not and will not infringe any claim of the '382 patent, either literally or under the doctrine of equivalents.

## COUNT VI
### (Declaratory Judgment of Non-Infringement of the '513 Patent for Atticus's Asenra™)

326.    Atticus repeats and realleges Paragraphs 1-325 of this Complaint as if fully set forth herein.

327.    In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '513 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Asenra™ product.

328.    Atticus has taken concrete steps to prepare to distribute and sell its Asenra™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Asenra™ product, such as the submission of the CSF for its Asenra™ product, and developing marketing materials for its Asenra™ product.

329.    Atticus expects to receive EPA approval for its Asenra™ product within three months of the filing of this action, and certainly long before the expiration of the '513 patent. Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

330.    Upon EPA approval and any state approval for its Asenra™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Asenra™ product within the United States.

331.    FMC has not offered a covenant that it will not sue Atticus for infringing the '513 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Asenra™ product within the United States.

332.    Atticus's Asenra™ product does not infringe any claim of the '513 patent, either literally or under the doctrine of equivalents.

333.    In particular, every claim of the '513 patent requires "(d) from about 20 to about 60% of one or more water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed." Ex. 2 at col. 43.

334.    Atticus's Asenra™ product does not meet all claim limitations, for example because it does not contain a water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed, as required by every claim of the '513 patent. Thus, for at least this reason, Atticus's Asenra™ product does not meet each and every limitation of any claim of the '513 patent and therefore does not literally infringe the '513 patent.

335.    Atticus's Asenra™ product does not contain an ingredient that could be deemed an equivalent to the claimed "methylated seed oil." Specifically, no component in Atticus's Asenra™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the methylated seed oil claimed in the '513 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Asenra™ product and (b) the "water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed" limitation required for each claim of the '513 patent.

336.    Atticus seeks a declaration that its Asenra™ product does not and will not infringe any claim of the '513 patent, either literally or under the doctrine of equivalents.

## COUNT VII
### (Declaratory Judgment of Non-Infringement of the '756 Patent for Atticus's Asenra™)

337.    Atticus repeats and realleges Paragraphs 1-336 of this Complaint as if fully set forth herein.

338.    In view of the allegations set forth herein, there is an actual, justiciable, substantial, and

immediate controversy between Atticus and FMC concerning the '756 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Asenra™ product.

339. Atticus has taken concrete steps to prepare to distribute and sell its Asenra™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Asenra™ product, such as the submission of the CSF for its Asenra™ product, and developing marketing materials for its Asenra™ product.

340. Atticus expects to receive EPA approval for its Asenra™ product within three months of the filing of this action, and certainly long before the expiration of the '756 patent. Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

341. Upon EPA approval and any state approval for its Asenra™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Asenra™ product within the United States.

342. FMC has not offered a covenant that it will not sue Atticus for infringing the '756 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Asenra™ product within the United States.

343. Atticus's Asenra™ product does not infringe any claim of the '756 patent, either literally or under the doctrine of equivalents.

344. In particular, every claim of the '756 patent requires "(c) about 30 to about 95% of at least one water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed." Ex. 3 at col. 35.

345. Atticus's Asenra™ product does not meet all claim limitations, for example because it does not contain a "water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed," as required by every claim of the '756 patent. Thus, for at least this reason, Atticus's Asenra™ product does not meet each and every limitation of any claim of the '756 patent and therefore does not literally infringe the '756 patent.

54

346.     Atticus's Asenra™ does not contain an ingredient that could be deemed an equivalent to the claimed "methylated seed oil."  Specifically, no component in Atticus's Asenra™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the methylated seed oil claimed in the '756 patent.  Furthermore, there are substantial differences between (a) each ingredient of Atticus's Asenra™ product and (b) the "water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed" limitation required for each claim of the '756 patent.

347.     Atticus seeks a declaration that its Asenra™ product does not and will not infringe any claim of the '756 patent, either literally or under the doctrine of equivalents.

## COUNT VIII
### (Declaratory Judgment of Non-Infringement of the '737 Patent for Atticus's Asenra™)

348.     Atticus repeats and realleges Paragraphs 1-347 of this Complaint as if fully set forth herein.

349.     In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '737 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Asenra™ product.

350.     Atticus has taken concrete steps to prepare to distribute and sell its Asenra™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Asenra™ product, such as the submission of the CSF for its Asenra™ product, and developing marketing materials for its Asenra™ product.

351.     Atticus expects to receive EPA approval for Asenra™ within three months of the filing of this action, and certainly long before the expiration of the '737 patent.  Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

352.     Upon EPA approval and any state approval for its Asenra™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Asenra™ product within the United States.

353. FMC has not offered a covenant that it will not sue Atticus for infringing the '737 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Asenra™ product within the United States.

354. Atticus's Asenra™ product does not infringe any claim of the '737 patent, either literally or under the doctrine of equivalents.

355. In particular, every claim of the '737 patent requires "(ii) a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl)polyglycoside; an ethylene oxide-propylene oxide block copolymer consisting of 11 ethylene oxide-derived units, then 16 propylene oxide block copolymers and then 11 ethylene oxide-derived units; and polyoxyethylene (20) sorbitan monolaurate." Ex. 4 at col. 40.

356. Atticus's Asenra™ product does not meet all claim limitations, for example because it does not contain "a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate," as required by every claim of the '737 patent. Thus, for at least this reason, Atticus's Asenra™ product does not meet each and every limitation of any claim of the '737 patent and therefore does not literally infringe the '737 patent.

357. Atticus's Asenra™ product does not contain an ingredient that could be deemed an equivalent to "a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate." Specifically, no component in Atticus's Asenra™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the surfactant claimed in the '756 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Asenra™ product and (b) the "surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate" limitation required for each claim of the '737 patent.

358. Atticus seeks a declaration that its Asenra™ product does not and will not infringe any

claim of the '737 patent, either literally or under the doctrine of equivalents.

## COUNT IX
### (Declaratory Judgment of Non-Infringement of the '382 Patent
### for Atticus's Contigo™)

359.   Atticus repeats and realleges Paragraphs 1-358 of this Complaint as if fully set forth herein.

360.   In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '382 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Contigo™ product.

361.   Atticus has taken concrete steps to prepare to distribute and sell its Contigo™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Contigo™ product, such as the submission of the CSF for its Contigo™ product, and developing marketing materials for its Contigo™ product.

362.   Atticus expects to receive EPA approval for Contigo™ within three months of the filing of this action, and certainly long before the expiration of the '382 patent.  Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

363.   Upon EPA approval and any state approval for its Contigo™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Contigo™ product within the United States.

364.   FMC has not offered a covenant that it will not sue Atticus for infringing the '382 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Contigo™ product within the United States.

365.   Atticus's Contigo™ product does not infringe any claim of the '382 patent, either literally or under the doctrine of equivalents.

366.   In particular, every claim of the '382 patent requires "(b) from about 9 to about 91% of a nonionic ethylene oxide-propylene oxide block copolymer component selected from poloxamers, reverse poloxamers, poloxamines and reverse poloxamines, having a water solubility of at least about 5% by weight

57

at 20° C, a hydrophilic-lipophilic balance value of at least or about 5 and an average molecular weight ranging from about 3000 to about 20000 daltons." Ex. 1 at cols. 47-48.

367.    Atticus's Contigo™ product does not meet all claim limitations, for example because it does not contain a nonionic ethylene oxide-propylene oxide block copolymer component selected from poloxamers, reverse poloxamers, poloxamines and reverse poloxamines, as required by every claim of the '382 patent. Thus, for at least this reason, Atticus's Contigo™ product does not meet each and every limitation of any claim of the '382 patent and therefore does not literally infringe the '382 patent.

368.    Atticus's Contigo™ product does not contain an ingredient that could be deemed an equivalent to "poloxamers, reverse poloxamers, poloxamines and reverse poloxamines." Specifically, no component in Atticus's Contigo™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the nonionic ethylene oxide-propylene oxide block copolymer component as claimed in the '382 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Contigo™ product and (b) the "a nonionic ethylene oxide-propylene oxide block copolymer component" limitation required for each claim of the '382 patent.

369.    Atticus seeks a declaration that its Contigo™ product does not and will not infringe any claim of the '382 patent, either literally or under the doctrine of equivalents.

## COUNT X
### (Declaratory Judgment of Non-Infringement of the '513 Patent for Atticus's Contigo™ Product)

370.    Atticus repeats and realleges Paragraphs 1-369 of this Complaint as if fully set forth herein.

371.    In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '513 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Contigo™ product.

372.    Atticus has taken concrete steps to prepare to distribute and sell its Contigo™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Contigo™ product, such as the submission of the

58

CSF for its Contigo™ product, and developing marketing materials for its Contigo™ product.

373. Atticus expects to receive EPA approval for its Contigo™ product within three months of the filing of this action, and certainly long before the expiration of the '513 patent. Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

374. Upon EPA approval and any state approval for its Contigo™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Contigo™ product within the United States.

375. FMC has not offered a covenant that it will not sue Atticus for infringing the '513 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Contigo™ product within the United States.

376. Atticus's Contigo™ product does not infringe any claim of the '513 patent, either literally or under the doctrine of equivalents.

377. In particular, every claim of the '513 patent requires "(d) from about 20 to about 60% of one or more water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed." Ex. 2 at col. 43.

378. Atticus's Contigo™ product does not meet all claim limitations, for example because it does not contain a water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed, as required by every claim of the '513 patent. Thus, for at least this reason, Atticus's Contigo™ product does not meet each and every limitation of any claim of the '513 patent and therefore does not literally infringe the '513 patent.

379. Atticus's Contigo™ product does not contain an ingredient that could be deemed an equivalent to the claimed "methylated seed oil." Specifically, no component in Atticus's Contigo™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the methylated seed oil claimed in the '513 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Contigo™ product and (b) the "water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed" limitation

required for each claim of the '513 patent.

380.    Atticus seeks a declaration that its Contigo™ product does not and will not infringe any claim of the '513 patent, either literally or under the doctrine of equivalents.

### COUNT XI
### (Declaratory Judgment of Non-Infringement of the
### '756 Patent for Atticus's Contigo™ Product)

381.    Atticus repeats and realleges Paragraphs 1-380 of this Complaint as if fully set forth herein.

382.    In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '756 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Contigo™ product.

383.    Atticus has taken concrete steps to prepare to distribute and sell its Contigo™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Contigo™ product, such as the submission of the CSF for its Contigo™ product, and developing marketing materials for its Contigo™ product.

384.    Atticus expects to receive EPA approval for its Contigo™ product within three months of the filing of this action, and certainly long before the expiration of the '756 patent. Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

385.    Upon EPA approval and any state approval for Contigo™, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Contigo™ product within the United States.

386.    FMC has not offered a covenant that it will not sue Atticus for infringing the '756 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Contigo™ product within the United States.

387.    Atticus's Contigo™ product does not infringe any claim of the '756 patent, either literally or under the doctrine of equivalents.

388.    In particular, every claim of the '756 patent requires "(c) about 30 to about 95% of at least one water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of

sunflower, soybean, cotton or linseed." Ex. 3 at col. 35.

389.    Atticus's Contigo™ product does not meet all claim limitations, for example because it does not contain a "water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed," as required by every claim of the '756 patent. Thus, for at least this reason, Atticus's Contigo™ product does not meet each and every limitation of any claim of the '756 patent and therefore does not literally infringe the '756 patent.

390.    Atticus's Contigo™ product does not contain an ingredient that could be deemed an equivalent to the claimed "methylated seed oil." Specifically, no component in Atticus's Contigo™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the methylated seed oil claimed in the '756 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Contigo™ product and (b) the "water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed" limitation required for each claim of the '756 patent.

391.    Atticus seeks a declaration that its Contigo™ product does not and will not infringe any claim of the '756 patent, either literally or under the doctrine of equivalents.

## COUNT XII
### (Declaratory Judgment of Non-Infringement of the '737 Patent for Atticus's Contigo™ Product)

392.    Atticus repeats and realleges Paragraphs 1-391 of this Complaint as if fully set forth herein.

393.    In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '737 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Contigo™ product.

394.    Atticus has taken concrete steps to prepare to distribute and sell its Contigo™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Contigo™ product, such as the submission of the CSF for its Contigo™ product, and developing marketing materials for its Contigo™ product.

61

395.    Atticus expects to receive EPA approval for Contigo™ within three months of the filing of this action, and certainly long before the expiration of the '737 patent. Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

396.    Upon EPA approval and any state approval for its Contigo™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Contigo™ product within the United States.

397.    FMC has not offered a covenant that it will not sue Atticus for infringing the '737 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Contigo™ product within the United States.

398.    Atticus's Contigo™ product does not infringe any claim of the '737 patent, either literally or under the doctrine of equivalents.

399.    In particular, every claim of the '737 patent requires "(ii) a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl)polyglycoside; an ethylene oxide-propylene oxide block copolymer consisting of 11 ethylene oxide-derived units, then 16 propylene oxide block copolymers and then 11 ethylene oxide-derived units; and polyoxyethylene (20) sorbitan monolaurate." Ex. 4 at col. 40.

400.    Atticus's Contigo™ product does not meet all claim limitations, for example because it does not contain "a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate," as required by every claim of the '737 patent. Thus, for at least this reason, Atticus's Contigo™ product does not meet each and every limitation of any claim of the '737 patent and therefore does not literally infringe the '737 patent.

401.    Atticus's Contigo™ product does not contain an ingredient that could be deemed an equivalent to "a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate." Specifically, no component in Atticus's Contigo™ product performs substantially the same

function, in substantially the same way, to achieve substantially the same result as the surfactant claimed in the '737 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Contigo™ product and (b) the "surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate" limitation required for each claim of the '737 patent.

402.     Atticus seeks a declaration that its Contigo™ product does not and will not infringe any claim of the '737 patent, either literally or under the doctrine of equivalents.

### COUNT XIII
### (Declaratory Judgment of Non-Infringement of the '382 Patent
### for Atticus's Asenra MC™ Product)

403.     Atticus repeats and realleges Paragraphs 1-402 of this Complaint as if fully set forth herein.

404.     In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '382 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Asenra MC™ product.

405.     Atticus has taken concrete steps to prepare to distribute and sell its Asenra MC™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Asenra MC™ product, such as the submission of the CSFs for its Asenra MC™ product, and developing marketing materials for its Asenra MC™ product.

406.     Atticus expects to receive EPA approval for its Asenra MC™ product within three months of the filing of this action, and certainly long before the expiration of the '382 patent. Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

407.     Upon EPA approval and any state approval for its Asenra MC™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Asenra MC™ product within the United States.

408.     FMC has not offered a covenant that it will not sue Atticus for infringing the '382 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Asenra MC™ product

63

within the United States.

409. Atticus's Asenra MC™ product does not infringe any claim of the '382 patent, either literally or under the doctrine of equivalents.

410. In particular, every claim of the '382 patent requires "(b) from about 9 to about 91% of a nonionic ethylene oxide-propylene oxide block copolymer component selected from poloxamers, reverse poloxamers, poloxamines and reverse poloxamines, having a water solubility of at least about 5% by weight at 20° C, a hydrophilic-lipophilic balance value of at least or about 5 and an average molecular weight ranging from about 3000 to about 20000 daltons." Ex. 1 at cols. 47-48.

411. Atticus's Asenra MC™ product does not meet all claim limitations, for example because it does not contain a nonionic ethylene oxide-propylene oxide block copolymer component selected from poloxamers, reverse poloxamers, poloxamines and reverse poloxamines, as required by every claim of the '382 patent. Thus, for at least this reason, Atticus's Asenra MC™ product does not meet each and every limitation of any claim of the '382 patent and therefore does not literally infringe the '382 patent.

412. Atticus's Asenra MC™ product does not contain an ingredient that could be deemed an equivalent to "poloxamers, reverse poloxamers, poloxamines and reverse poloxamines." Specifically, no component in Atticus's Asenra MC™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the nonionic ethylene oxide-propylene oxide block copolymer component as claimed in the '382 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Asenra MC™ product and (b) the "a nonionic ethylene oxide-propylene oxide block copolymer component" limitation required for each claim of the '382 patent.

413. Atticus seeks a declaration that its Asenra MC™ product does not and will not infringe any claim of the '382 patent, either literally or under the doctrine of equivalents.

## COUNT XIV
### (Declaratory Judgment of Non-Infringement of the '513 Patent for Atticus's Asenra MC™ Product)

414. Atticus repeats and realleges Paragraphs 1-413 of this Complaint as if fully set forth herein.

415. In view of the allegations set forth herein, there is an actual, justiciable, substantial, and

immediate controversy between Atticus and FMC concerning the '513 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Asenra MC™ product.

416.    Atticus has taken concrete steps to prepare to distribute and sell its Asenra MC™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Asenra MC™ product, such as the submission of the CSF for its Asenra MC™ product, and developing marketing materials for its Asenra MC™ product.

417.    Atticus expects to receive EPA approval for its Asenra MC™ product within three months of the filing of this action, and certainly long before the expiration of the '513 patent. Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

418.    Upon EPA approval and any state approval for its Asenra MC™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Asenra MC™ product within the United States.

419.    FMC has not offered a covenant that it will not sue Atticus for infringing the '513 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Asenra MC™ product within the United States.

420.    Atticus's Asenra MC™ product does not infringe any claim of the '513 patent, either literally or under the doctrine of equivalents.

421.    In particular, every claim of the '513 patent requires "(d) from about 20 to about 60% of one or more water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed." Ex. 2 at col. 43.

422.    Atticus's Asenra MC™ product does not meet all claim limitations, for example because it does not contain a water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed, as required by every claim of the '513 patent. Thus, for at least this reason, Atticus's Asenra MC™ product does not meet each and every limitation of any claim of the '513 patent and therefore does not literally infringe the '513 patent.

65

423. Atticus's Asenra MC™ product does not contain an ingredient that could be deemed an equivalent to the claimed "methylated seed oil." Specifically, no component in Atticus's Asenra MC™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the methylated seed oil claimed in the '513 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Asenra MC™ product and (b) the "water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed" limitation required for each claim of the '513 patent.

424. Atticus seeks a declaration that its Asenra MC™ product does not and will not infringe any claim of the '513 patent, either literally or under the doctrine of equivalents.

## COUNT XV
### (Declaratory Judgment of Non-Infringement of the '756 Patent for Atticus's Asenra MC™ product)

425. Atticus repeats and realleges Paragraphs 1-424 of this Complaint as if fully set forth herein.

426. In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '756 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Asenra MC™ product.

427. Atticus has taken concrete steps to prepare to distribute and sell its Asenra MC™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Asenra MC™ product, such as the submission of the CSF for its Asenra MC™ product, and developing marketing materials for its Asenra MC™ product.

428. Atticus expects to receive EPA approval for its Asenra MC™ product within three months of the filing of this action, and certainly long before the expiration of the '756 patent. Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

429. Upon EPA approval and any state approval for its Asenra MC™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Asenra MC™ product within the United States.

430. FMC has not offered a covenant that it will not sue Atticus infringing the '756 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Asenra MC™ product within the United States.

431. Atticus's Asenra MC™ product does not infringe any claim of the '756 patent, either literally or under the doctrine of equivalents.

432. In particular, every claim of the '756 patent requires "(c) about 30 to about 95% of at least one water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed." Ex. 3 at col. 35.

433. Atticus's Asenra MC™ product does not meet all claim limitations, for example because it does not contain a "water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed," as required by every claim of the '756 patent. Thus, for at least this reason, Atticus's Asenra MC™ product does not meet each and every limitation of any claim of the '756 patent and therefore does not literally infringe the '756 patent.

434. Atticus's Asenra MC™ product does not contain an ingredient that could be deemed an equivalent to the claimed "methylated seed oil." Specifically, no component in Atticus's Asenra MC™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the methylated seed oil claimed in the '756 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Asenra MC™ product and (b) the "water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed" limitation required for each claim of the '756 patent.

435. Atticus seeks a declaration that its Asenra MC™ product does not and will not infringe any claim of the '756 patent, either literally or under the doctrine of equivalents.

<u>COUNT XVI</u>
<u>(Declaratory Judgment of Non-Infringement of the</u>
<u>'737 Patent for Atticus's Asenra MC™)</u>

436. Atticus repeats and realleges Paragraphs 1-435 of this Complaint as if fully set forth herein.

437. In view of the allegations set forth herein, there is an actual, justiciable, substantial, and

67

immediate controversy between Atticus and FMC concerning the '737 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Asenra MC™ product.

438.    Atticus has taken concrete steps to prepare to distribute and sell its Asenra MC™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Asenra MC™ product, such as the submission of the CSF for its Asenra MC™ product, and developing marketing materials for its Asenra MC™ product.

439.    Atticus expects to receive EPA approval for its Asenra MC™ product within three months of the filing of this action, and certainly long before the expiration of the '737 patent. Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

440.    Upon EPA approval and any state approval for its Asenra MC™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Asenra MC™ product within the United States.

441.    FMC has not offered a covenant that it will not sue Atticus for infringing the '737 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Asenra MC™ product within the United States.

442.    Atticus's Asenra MC™ product does not infringe any claim of the '737 patent, either literally or under the doctrine of equivalents.

443.    In particular, every claim of the '737 patent requires "(ii) a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl)polyglycoside; an ethylene oxide-propylene oxide block copolymer consisting of 11 ethylene oxide-derived units, then 16 propylene oxide block copolymers and then 11 ethylene oxide-derived units; and polyoxyethylene (20) sorbitan monolaurate." Ex. 4 at col. 40.

444.    Atticus's Asenra MC™ product does not meet all claim limitations, for example because it does not contain "a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20)

sorbitan monolaurate," as required by every claim of the '737 patent. Thus, for at least this reason, Atticus's Asenra MC™ product does not meet each and every limitation of any claim of the '737 patent and therefore does not literally infringe the '737 patent.

445. Atticus's Asenra MC™ product does not contain an ingredient that could be deemed an equivalent to or "a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate." Specifically, no component in Atticus's Asenra MC™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the surfactant claimed in the '737 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Asenra MC™ product and (b) the "surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate" limitation required for each claim of the '737 patent.

446. Atticus seeks a declaration that its Asenra MC™ product does not and will not infringe any claim of the '737 patent, either literally or under the doctrine of equivalents.

## COUNT XVII
### (Declaratory Judgment of Non-Infringement of the '382 Patent for Atticus's Pixovere™ Product)

447. Atticus repeats and realleges Paragraphs 1-446 of this Complaint as if fully set forth herein.

448. In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '382 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Pixovere™ product.

449. Atticus has taken concrete steps to prepare to distribute and sell its Pixovere™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Pixovere™ product, such as the submission of the CSF for its Pixovere™ product, and developing marketing materials for its Pixovere™ product.

450. Atticus expects to receive EPA approval for its Pixovere™ product within three months of

the filing of this action, and certainly long before the expiration of the '382 patent. Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

451. Upon EPA approval and any state approval for its Pixovere™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Pixovere™ product within the United States.

452. FMC has not offered a covenant that it will not sue Atticus for infringing the '382 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Pixovere™ product within the United States.

453. Atticus's Pixovere™ product does not infringe any claim of the '382 patent, either literally or under the doctrine of equivalents.

454. In particular, every claim of the '382 patent requires "(a) from about 9 to about 91% of one or more anthranilic diamide insecticides" and "(b) from about 9 to about 91% of a nonionic ethylene oxide-propylene oxide block copolymer component selected from poloxamers, reverse poloxamers, poloxamines and reverse poloxamines, having a water solubility of at least about 5% by weight at 20° C, a hydrophilic-lipophilic balance value of at least or about 5 and an average molecular weight ranging from about 3000 to about 20000 daltons." Ex. 1 at cols. 47-48.

455. Atticus's Pixovere™ product does not meet all the claim limitations, for example because it does not meet the percent composition of anthranilic diamide insecticides and also because does not contain a nonionic ethylene oxide-propylene oxide block copolymer component selected from poloxamers, reverse poloxamers, poloxamines and reverse poloxamines, as required by every claim of the '382 patent. Thus, for at least these reasons, Atticus's Pixovere™ product does not meet each and every limitation of any claim of the '382 patent and therefore does not literally infringe the '382 patent.

456. Atticus's Pixovere™ product does not contain an ingredient that could be deemed an equivalent to "poloxamers, reverse poloxamers, poloxamines and reverse poloxamines." Specifically, no component in Atticus's Pixovere™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the nonionic ethylene oxide-propylene oxide block

70

copolymer component as claimed in the '382 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Pixovere™ product and (b) the "a nonionic ethylene oxide-propylene oxide block copolymer component" limitation required for each claim of the '382 patent.

457. Atticus seeks a declaration that its Pixovere™ product does not and will not infringe any claim of the '382 patent, either literally or under the doctrine of equivalents.

### COUNT XVIII
### (Declaratory Judgment of Non-Infringement of the
### '513 Patent for Atticus's Pixovere™ Product)

458. Atticus repeats and realleges Paragraphs 1-457 of this Complaint as if fully set forth herein.

459. In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '513 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Pixovere™ product.

460. Atticus has taken concrete steps to prepare to distribute and sell its Pixovere™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Pixovere™ product, such as the submission of the CSF for its Pixovere™ product, and developing marketing materials for its Pixovere™ product.

461. Atticus expects to receive EPA approval for its Pixovere™ product within three months of the filing of this action, and certainly long before the expiration of the '513 patent. Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

462. Upon EPA approval and any state approval for its Pixovere™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Pixovere™ product within the United States.

463. FMC has not offered a covenant that it will not sue Atticus for infringing the '513 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Pixovere™ product within the United States.

464. Atticus's Pixovere™ product does not infringe any claim of the '513 patent, either literally

71

or under the doctrine of equivalents.

465. In particular, every claim of the '513 patent requires "(d) from about 20 to about 60% of one or more water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed." Ex. 2 at col. 43.

466. Atticus's Pixovere™ product does not meet all claim limitations, for example because it does not contain a water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed, as required by every claim of the '513 patent. Thus, for at least this reason, Atticus's Pixovere™ product does not meet each and every limitation of any claim of the '513 patent and therefore does not literally infringe the '513 patent.

467. Atticus's Pixovere™ product does not contain an ingredient that could be deemed an equivalent to the claimed "methylated seed oil." Specifically, no component in Atticus's Pixovere™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the methylated seed oil claimed in the '513 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Pixovere™ product and (b) the "water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed" limitation required for each claim of the '513 patent.

468. Atticus seeks a declaration that its Pixovere™ product does not and will not infringe any claim of the '513 patent, either literally or under the doctrine of equivalents.

## COUNT XIX
### (Declaratory Judgment of Non-Infringement of the '756 Patent for Atticus's Pixovere™ Product)

469. Atticus repeats and realleges Paragraphs 1-468 of this Complaint as if fully set forth herein.

470. In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '756 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Pixovere™ product.

471. Atticus has taken concrete steps to prepare to distribute and sell its Pixovere™ product, including conducting the required research and formulation development work outside the United States,

72

preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Pixovere™ product, such as the submission of the CSF for its Pixovere™ product, and developing marketing materials for its Pixovere™ product.

472. Atticus expects to receive EPA approval for its Pixovere™ product within three months of the filing of this action, and certainly long before the expiration of the '756 patent. Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

473. Upon EPA approval and any state approval for its Pixovere™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Pixovere™ product within the United States.

474. FMC has not offered a covenant that it will not sue Atticus for infringing the '756 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Pixovere™ product within the United States.

475. Atticus's Pixovere™ product does not infringe any claim of the '756 patent, either literally or under the doctrine of equivalents.

476. In particular, every claim of the '756 patent requires "(c) about 30 to about 95% of at least one water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed." Ex. 3 at col. 35.

477. Atticus's Pixovere™ product does not meet all claim limitations, for example because it does not contain a "water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed," as required by every claim of the '756 patent. Thus, for at least this reason, Atticus's Pixovere™ product does not meet each and every limitation of any claim of the '756 patent and therefore does not literally infringe the '756 patent.

478. Atticus's Pixovere™ product does not contain an ingredient that could be deemed an equivalent to the claimed "methylated seed oil." For example, no component in Atticus's Pixovere™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the methylated seed oil claimed in the '756 patent. Furthermore, there are substantial differences

between (a) each ingredient of Atticus's Pixovere™ product and (b) the "water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed" limitation required for each claim of the '756 patent.

479.     Atticus seeks a declaration that its Pixovere™ product does not and will not infringe any claim of the '756 patent, either literally or under the doctrine of equivalents.

**COUNT XX**
**(Declaratory Judgment of Non-Infringement of the**
**'737 Patent for Atticus's Pixovere™ Product)**

480.     Atticus repeats and realleges Paragraphs 1-479 of this Complaint as if fully set forth herein.

481.     In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '737 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Pixovere™ product.

482.     Atticus has taken concrete steps to prepare to distribute and sell its Pixovere™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Pixovere™ product, such as the submission of the CSF for its Pixovere™ product, and developing marketing materials for its Pixovere™ product.

483.     Atticus expects to receive EPA approval for its Pixovere™ product within three months of the filing of this action, and certainly long before the expiration of the '737 patent. Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

484.     Upon EPA approval and any state approval for its Pixovere™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Pixovere™ product within the United States.

485.     FMC has not offered a covenant that it will not sue Atticus for infringing the '737 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Pixovere™ product within the United States.

486.     Atticus's Pixovere™ product does not infringe any claim of the '737 patent, either literally

or under the doctrine of equivalents.

487. In particular, every claim of the '737 patent requires "(ii) a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a (C$_{12}$-C$_{16}$ alkyl)polyglycoside; an ethylene oxide-propylene oxide block copolymer consisting of 11 ethylene oxide-derived units, then 16 propylene oxide block copolymers and then 11 ethylene oxide-derived units; and polyoxyethylene (20) sorbitan monolaurate." Ex. 4 at col. 40.

488. Atticus's Pixovere™ product does not meet all claim limitations, for example because it does not contain "a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a (C$_{12}$-C$_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate," as required by every claim of the '737 patent. Thus, for at least this reason, Atticus's Pixovere™ product does not meet each and every limitation of any claim of the '737 patent and therefore does not literally infringe the '737 patent.

489. Atticus's Pixovere™ product does not contain an ingredient that could be deemed an equivalent to "a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a (C$_{12}$-C$_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate." For example, no component in Atticus's Pixovere™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the surfactant claimed in the '737 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Pixovere™ product and (b) the "surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a (C$_{12}$-C$_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate" limitation required for each claim of the '737 patent.

490. Atticus seeks a declaration that its Pixovere™ product does not and will not infringe any claim of the '737 patent, either literally or under the doctrine of equivalents.

<u>COUNT XXI</u>
<u>(Declaratory Judgment of Non-Infringement of the '382 Patent</u>
<u>for Atticus's Kylix™ Product)</u>

491. Atticus repeats and realleges Paragraphs 1-490 of this Complaint as if fully set forth herein.

492.    In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '382 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Kylix™ product.

493.    Atticus has taken concrete steps to prepare to distribute and sell its Kylix™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Kylix™ product , such as the submission of the CSF for its Kylix™ product, and developing marketing materials for its Kylix™ product.

494.    Atticus expects to receive EPA approval for its Kylix™ product within three months of the filing of this action, and certainly long before the expiration of the '382 patent.  Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

495.    Upon EPA approval and any state approval for Kylix™, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Kylix™ product within the United States.

496.    FMC has not offered a covenant that it will not sue Atticus for infringing the '382 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Kylix™ product within the United States.

497.    Atticus's Kylix™ product does not infringe any claim of the '382 patent, either literally or under the doctrine of equivalents.

498.    In particular, every claim of the '382 patent requires "(b) from about 9 to about 91% of a nonionic ethylene oxide-propylene oxide block copolymer component selected from poloxamers, reverse poloxamers, poloxamines and reverse poloxamines, having a water solubility of at least about 5% by weight at 20° C, a hydrophilic-lipophilic balance value of at least or about 5 and an average molecular weight ranging from about 3000 to about 20000 daltons."  Ex. 1 at cols. 47-48.

499.    Atticus's Kylix™ product does not meet all claim limitations, for example because it does not contain a nonionic ethylene oxide-propylene oxide block copolymer component selected from poloxamers, reverse poloxamers, poloxamines and reverse poloxamines, as required by every claim of the '382

patent. Thus, for at least this reason, Atticus's Kylix™ product does not meet each and every limitation of any claim of the '382 patent and therefore does not literally infringe the '382 patent.

500. Atticus's Kylix™ product does not contain an ingredient that could be deemed an equivalent to "poloxamers, reverse poloxamers, poloxamines and reverse poloxamines." Specifically, no component in Atticus's Kylix™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the nonionic ethylene oxide-propylene oxide block copolymer component as claimed in the '382 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Kylix™ product and (b) the "a nonionic ethylene oxide-propylene oxide block copolymer component" limitation required for each claim of the '382 patent.

501. Atticus seeks a declaration that its Kylix™ product does not and will not infringe any claim of the '382 patent, either literally or under the doctrine of equivalents.

## COUNT XXII
### (Declaratory Judgment of Non-Infringement of the '513 Patent for Atticus's Kylix™ Product)

502. Atticus repeats and realleges Paragraphs 1-501 of this Complaint as if fully set forth herein.

503. In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '513 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Kylix™ product.

504. Atticus has taken concrete steps to prepare to distribute and sell its Kylix™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Kylix™ product, such as the submission of the CSF for its Kylix™ product, and developing marketing materials for its Kylix™ product.

505. Atticus expects to receive EPA approval for its Kylix™ product within three months of the filing of this action, and certainly long before the expiration of the '513 patent. Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

506. Upon EPA approval and any state approval for its Kylix™ product, Atticus intends to begin

importing, making, using, selling, and/or offering to sell its Kylix™ product within the United States.

507. FMC has not offered a covenant that it will not sue Atticus for infringing the '513 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Kylix™ product within the United States.

508. Atticus's Kylix™ product does not infringe any claim of the '513 patent, either literally or under the doctrine of equivalents.

509. In particular, every claim of the '513 patent requires "(d) from about 20 to about 60% of one or more water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed." Ex. 2 at col. 43.

510. Atticus's Kylix™ does not meet all claim limitations, for example because it does not contain a water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed, as required by every claim of the '513 patent. Thus, for at least this reason, Atticus's Kylix™ does not meet each and every limitation of any claim of the '513 patent and therefore does not literally infringe the '513 patent.

511. Atticus's Kylix™ product does not contain an ingredient that could be deemed an equivalent to the claimed "methylated seed oil." Specifically, no component in Atticus's Kylix™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the methylated seed oil claimed in the '513 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Kylix™ product and (b) the "water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed" limitation required for each claim of the '513 patent.

512. Atticus seeks a declaration that its Kylix™ product does not and will not infringe any claim of the '513 patent, either literally or under the doctrine of equivalents.

**COUNT XXIII**
**(Declaratory Judgment of Non-Infringement of the**
**'756 Patent for Atticus's Kylix™)**

513. Atticus repeats and realleges Paragraphs 1-512 of this Complaint as if fully set forth herein.

78

514.    In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '756 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Kylix™ product.

515.    Atticus has taken concrete steps to prepare to distribute and sell its Kylix™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Kylix™ product, such as the submission of the CSF for its Kylix™ product, and developing marketing materials for its Kylix™ product.

516.    Atticus expects to receive EPA approval for its Kylix™ product within three months of the filing of this action, and certainly long before the expiration of the '756 patent.  Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

517.    Upon EPA approval and any state approval for its Kylix™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Kylix™ product within the United States.

518.    FMC has not offered a covenant that it will not sue Atticus for infringing the '756 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Kylix™ product within the United States.

519.    Atticus's Kylix™ product does not infringe any claim of the '756 patent, either literally or under the doctrine of equivalents.

520.    In particular, every claim of the '756 patent requires "(c) about 30 to about 95% of at least one water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed."  Ex. 3 at col. 35.

521.    Atticus's Kylix™ product does not meet all claim limitations, for example because it does not contain a "water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed," as required by every claim of the '756 patent.  Thus, for at least this reason, Atticus's Kylix™ product does not meet each and every limitation of any claim of the '756 patent and therefore does not literally infringe the '756 patent.

79

522.     Atticus's Kylix™ product does not contain an ingredient that could be deemed an equivalent to the claimed "methylated seed oil."  Specifically, no component in Atticus's Kylix™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the methylated seed oil claimed in the '756 patent.  Furthermore, there are substantial differences between (a) each ingredient of Atticus's Kylix™ product and (b) the "water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed" limitation required for each claim of the '756 patent.

523.     Atticus seeks a declaration that its Kylix™ product does not and will not infringe any claim of the '756 patent, either literally or under the doctrine of equivalents.

### COUNT XXIV
### (Declaratory Judgment of Non-Infringement of the
### '737 Patent for Atticus's Kylix™ Product)

524.     Atticus repeats and realleges Paragraphs 1-523 of this Complaint as if fully set forth herein.

525.     In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '737 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Kylix™ product.

526.     Atticus has taken concrete steps to prepare to distribute and sell its Kylix™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Kylix™ product, such as the submission of the CSF for its Kylix™ product, and developing marketing materials for its Kylix™ product.

527.     Atticus expects to receive EPA approval for its Kylix™ product within three months of the filing of this action, and certainly long before the expiration of the '737 patent.  Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

528.     Upon EPA approval and any state approval for its Kylix™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Kylix™ product within the United States.

529.     FMC has not offered a covenant that it will not sue Atticus for infringing the '737 patent,

once Atticus begins making, using, selling, offering to sell, and/or importing its Kylix™ product within the United States.

530.    Atticus's Kylix™ product does not infringe any claim of the '737 patent, either literally or under the doctrine of equivalents.

531.    In particular, every claim of the '737 patent requires "(ii) a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl)polyglycoside; an ethylene oxide-propylene oxide block copolymer consisting of 11 ethylene oxide-derived units, then 16 propylene oxide block copolymers and then 11 ethylene oxide-derived units; and polyoxyethylene (20) sorbitan monolaurate." Ex. 4 at col. 40.

532.    Atticus's Kylix™ product does not meet all claim limitations, for example because it does not contain "a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate," as required by every claim of the '737 patent. Thus, for at least this reason, Atticus's Kylix™ product does not meet each and every limitation of any claim of the '737 patent and therefore does not literally infringe the '737 patent.

533.    Atticus's Kylix™ product does not contain an ingredient that could be deemed an equivalent to "a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate." Specifically, no component in Atticus's Kylix™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the surfactant claimed in the '737 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Kylix™ product and (b) the "surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate" limitation required for each claim of the '737 patent.

534.    Atticus seeks a declaration that its Kylix™ product does not and will not infringe any claim of the '737 patent, either literally or under the doctrine of equivalents.

81

## COUNT XXV
### (Declaratory Judgment of Non-Infringement of the '382 Patent
### for Atticus's Osaria OPT™ Product)

535.    Atticus repeats and realleges Paragraphs 1-534 of this Complaint as if fully set forth herein.

536.    In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '382 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Osaria OPT™ product.

537.    Atticus has taken concrete steps to prepare to distribute and sell its Osaria OPT™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Osaria OPT™ product, such as the submission of the CSF for its Osaria OPT™ product, and developing marketing materials for its Osaria OPT™ product.

538.    Atticus expects to receive EPA approval for its Osaria OPT™ product within three months of the filing of this action, and certainly long before the expiration of the '382 patent.  Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

539.    Upon EPA approval and any state approval for its Osaria OPT™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sells its Osaria OPT™ product within the United States.

540.    FMC has not offered a covenant that it will not sue Atticus for infringing the '382 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Osaria OPT™ product within the United States.

541.    Atticus's Osaria OPT™ product does not infringe any claim of the '382 patent, either literally or under the doctrine of equivalents.

542.    In particular, every claim of the '382 patent requires "(b) from about 9 to about 91% of a nonionic ethylene oxide-propylene oxide block copolymer component selected from poloxamers, reverse poloxamers, poloxamines and reverse poloxamines, having a water solubility of at least about 5% by weight at 20° C, a hydrophilic-lipophilic balance value of at least or about 5 and an average molecular weight

ranging from about 3000 to about 20000 daltons."  Ex. 1 at cols. 47-48.

543.    Atticus's Osaria OPT™ product does not meet all claim limitations, for example because it does not contain a nonionic ethylene oxide-propylene oxide block copolymer component selected from poloxamers, reverse poloxamers, poloxamines and reverse poloxamines, as required by every claim of the '382 patent.  Thus, for at least this reason, Atticus's Osaria OPT™ product does not meet each and every limitation of any claim of the '382 patent and therefore does not literally infringe the '382 patent.

544.    Atticus's Osaria OPT™ product does not contain an ingredient that could be deemed an equivalent to "poloxamers, reverse poloxamers, poloxamines and reverse poloxamines."  Specifically, no component in Atticus's Osaria OPT™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the nonionic ethylene oxide-propylene oxide block copolymer component as claimed in the '382 patent.  Furthermore, there are substantial differences between (a) each ingredient of Atticus's Osaria OPT™ product and (b) the "a nonionic ethylene oxide-propylene oxide block copolymer component" limitation required for each claim of the '382 patent.

545.    Atticus seeks a declaration that its Osaria OPT™ product does not and will not infringe any claim of the '382 patent, either literally or under the doctrine of equivalents.

## COUNT XXVI
### (Declaratory Judgment of Non-Infringement of the '513 Patent for Atticus's Osaria OPT™ Product)

546.    Atticus repeats and realleges Paragraphs 1-545 of this Complaint as if fully set forth herein.

547.    In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '513 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Osaria OPT™ product.

548.    Atticus has taken concrete steps to prepare to distribute and sell its Osaria OPT™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Osaria OPT™ product, such as the submission of the CSF for its Osaria OPT™ product, and developing marketing materials for its Osaria OPT™ product.

549.    Atticus expects to receive EPA approval for its Osaria OPT™ product within three months of the filing of this action, and certainly long before the expiration of the '513 patent. Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

550.    Upon EPA approval and any state approval for its Osaria OPT™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Osaria OPT™ product within the United States.

551.    FMC has not offered a covenant that it will not sue Atticus for infringing the '513 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Osaria OPT™ product within the United States.

552.    Atticus's Osaria OPT™ product does not infringe any claim of the '513 patent, either literally or under the doctrine of equivalents.

553.    In particular, every claim of the '513 patent requires "(d) from about 20 to about 60% of one or more water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed." Ex. 2 at col. 43.

554.    Atticus's Osaria OPT™ product does not meet all claim limitations, for example because it does not contain a water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed, as required by every claim of the '513 patent. Thus, for at least this reason, Atticus's Osaria OPT™ product does not meet each and every limitation of any claim of the '513 patent and therefore does not literally infringe the '513 patent.

555.    Atticus's Osaria OPT™ product does not contain an ingredient that could be deemed an equivalent to the claimed "methylated seed oil." Specifically, no component in Atticus's Osaria OPT™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the methylated seed oil claimed in the '513 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Osaria OPT™ product and (b) the "water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed" limitation required for each claim of the '513 patent.

84

556. Atticus seeks a declaration that its Osaria OPT™ product does not and will not infringe any claim of the '513 patent, either literally or under the doctrine of equivalents.

## COUNT XXVII
### (Declaratory Judgment of Non-Infringement of the '756 Patent for Atticus's Osaria OPT™)

557. Atticus repeats and realleges Paragraphs 1-556 of this Complaint as if fully set forth herein.

558. In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '756 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Osaria OPT™ product.

559. Atticus has taken concrete steps to prepare to distribute and sell its Osaria OPT™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Osaria OPT™ product, such as the submission of the CSF for its Osaria OPT™ product, and developing marketing materials for its Osaria OPT™ product.

560. Atticus expects to receive EPA approval for its Osaria OPT™ product within three months of the filing of this action, and certainly long before the expiration of the '756 patent. Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

561. Upon EPA approval and any state approval for its Osaria OPT™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Osaria OPT™ product within the United States.

562. FMC has not offered a covenant that it will not sue Atticus for infringing the '756 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Osaria OPT™ product within the United States.

563. Atticus's Osaria OPT™ product does not infringe any claim of the '756 patent, either literally or under the doctrine of equivalents.

564. In particular, every claim of the '756 patent requires "(c) about 30 to about 95% of at least one water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of

sunflower, soybean, cotton or linseed." Ex. 3 at col. 35.

565. Atticus's Osaria OPT™ product does not meet all claim limitations, for example because it does not contain a "water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed," as required by every claim of the '756 patent. Thus, for at least this reason, Atticus's Osaria OPT™ product does not meet each and every limitation of any claim of the '756 patent and therefore does not literally infringe the '756 patent.

566. Atticus's Osaria OPT™ product does not contain an ingredient that could be deemed an equivalent to the claimed "methylated seed oil." Specifically, no component in Atticus's Osaria OPT™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the methylated seed oil claimed in the '756 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Osaria OPT™ product and (b) the "water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed" limitation required for each claim of the '756 patent.

567. Atticus seeks a declaration that its Osaria OPT™ product does not and will not infringe any claim of the '756 patent, either literally or under the doctrine of equivalents.

## COUNT XXVIII
### (Declaratory Judgment of Non-Infringement of the
### '737 Patent for Atticus's Osaria OPT™ Product)

568. Atticus repeats and realleges Paragraphs 1-567 of this Complaint as if fully set forth herein.

569. In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '737 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Osaria OPT™ product.

570. Atticus has taken concrete steps to prepare to distribute and sell its Osaria OPT™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Osaria OPT™ product, such as the submission of the CSF for its Osaria OPT™ product, and developing marketing materials for its Osaria OPT™ product.

86

571.    Atticus expects to receive EPA approval for its Osaria OPT™ product within three months of the filing of this action, and certainly long before the expiration of the '737 patent.  Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

572.    Upon EPA approval and any state approval for its Osaria OPT™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Osaria OPT™ product within the United States.

573.    FMC has not offered a covenant that it will not sue Atticus for infringing the '737 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Osaria OPT™ product within the United States.

574.    Atticus's Osaria OPT™ product does not infringe any claim of the '737 patent, either literally or under the doctrine of equivalents.

575.    In particular, every claim of the '737 patent requires "(ii) a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl)polyglycoside; an ethylene oxide-propylene oxide block copolymer consisting of 11 ethylene oxide-derived units, then 16 propylene oxide block copolymers and then 11 ethylene oxide-derived units; and polyoxyethylene (20) sorbitan monolaurate."  Ex. 4 at col. 40.

576.    Atticus's Osaria OPT™ product does not meet all claim limitations, for example because it does not contain "a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate," as required by every claim of the '737 patent.  Thus, for at least this reason, Atticus's Osaria OPT™ product does not meet each and every limitation of any claim of the '737 patent and therefore does not literally infringe the '737 patent.

577.    Atticus's Osaria OPT™ product does not contain an ingredient that could be deemed an equivalent to "a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate."  Specifically, no component in Atticus's Osaria OPT™ product performs substantially the

87

same function, in substantially the same way, to achieve substantially the same result as the surfactant claimed in the '737 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Osaria OPT™ product and (b) the "surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate" limitation required for each claim of the '737 patent.

578. Atticus seeks a declaration that its Osaria OPT™ product does not and will not infringe any claim of the '737 patent, either literally or under the doctrine of equivalents.

### COUNT XXIX
### (Declaratory Judgment of Non-Infringement of the '382 Patent for Atticus's Asenra G™ Product)

579. Atticus repeats and realleges Paragraphs 1-578 of this Complaint as if fully set forth herein.

580. In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '382 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Asenra G™ product.

581. Atticus has taken concrete steps to prepare to distribute and sell its Asenra G™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Asenra G™ product, such as the submission of the CSF for its Asenra G™ product, and developing marketing materials for its Asenra G™ product.

582. Atticus expects to receive EPA approval for its Asenra G™ product within three months of the filing of this action, and certainly long before the expiration of the '382 patent. Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

583. Upon EPA approval and any state approval for its Asenra G™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Asenra G™ product within the United States.

584. FMC has not offered a covenant that it will not sue Atticus for infringing the '382 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Asenra G™ product within

the United States.

585. Atticus's Asenra G™ product does not infringe any claim of the '382 patent, either literally or under the doctrine of equivalents.

586. In particular, every claim of the '382 patent requires "(a) from about 9 to about 91% of one or more anthranilic diamide insecticides" and "(b) from about 9 to about 91% of a nonionic ethylene oxide-propylene oxide block copolymer component selected from poloxamers, reverse poloxamers, poloxamines and reverse poloxamines, having a water solubility of at least about 5% by weight at 20° C, a hydrophilic-lipophilic balance value of at least or about 5 and an average molecular weight ranging from about 3000 to about 20000 daltons." Ex. 1 at cols. 47-48.

587. Atticus's Asenra G™ product does not meet all claim limitations, for example because it does not meet the percent composition of anthranilic diamide insecticides and also because it does not contain a nonionic ethylene oxide-propylene oxide block copolymer component selected from poloxamers, reverse poloxamers, poloxamines and reverse poloxamines, as required by every claim of the '382 patent. Thus, for at least these reasons, Atticus's Asenra G™ product does not meet each and every limitation of any claim of the '382 patent and therefore does not literally infringe the '382 patent.

588. Atticus's Asenra G™ product does not contain an ingredient that could be deemed an equivalent to "poloxamers, reverse poloxamers, poloxamines and reverse poloxamines." Specifically, no component in Atticus's Asenra G™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the nonionic ethylene oxide-propylene oxide block copolymer component as claimed in the '382 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Asenra G™ product and (b) the "a nonionic ethylene oxide-propylene oxide block copolymer component" limitation required for each claim of the '382 patent.

589. Atticus seeks a declaration that its Asenra G™ product does not and will not infringe any claim of the '382 patent, either literally or under the doctrine of equivalents.

89

## COUNT XXX
### (Declaratory Judgment of Non-Infringement of the
### '513 Patent for Atticus's Asenra G™ Product)

590.     Atticus repeats and realleges Paragraphs 1-589 of this Complaint as if fully set forth herein.

591.     In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '513 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Asenra G™ product.

592.     Atticus has taken concrete steps to prepare to distribute and sell its Asenra G™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Asenra G™ product, such as the submission of the CSF for its Asenra G™ product, and developing marketing materials for its Asenra G™ product.

593.     Atticus expects to receive EPA approval for its Asenra G™ product within three months of the filing of this action, and certainly long before the expiration of the '513 patent.  Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

594.     Upon EPA approval and any state approval for its Asenra G™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Asenra G™ product within the United States.

595.     FMC has not offered a covenant that it will not sue Atticus for infringing the '513 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Asenra G™ product within the United States.

596.     Atticus's Asenra G™ product does not infringe any claim of the '513 patent, either literally or under the doctrine of equivalents.

597.     In particular, every claim of the '513 patent requires "(d) from about 20 to about 60% of one or more water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed."  Ex. 2 at col. 43.

598.     Atticus's Asenra G™ product does not meet all claim limitations, for example because it

does not contain a water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed, as required by every claim of the '513 patent. Thus, for at least this reason, Atticus's Asenra G™ product does not meet each and every limitation of any claim of the '513 patent and therefore does not literally infringe the '513 patent.

599. Atticus's Asenra G™ product does not contain an ingredient that could be deemed an equivalent to the claimed "methylated seed oil." Specifically, no component in Atticus's Asenra G™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the methylated seed oil claimed in the '513 patent. Furthermore, there are substantial differences between (a) each ingredient of Atticus's Asenra G™ product and (b) the "water-immiscible liquid compounds comprising a methylated seed oil of sunflower, soybean, cotton, linseed, or rapeseed" limitation required for each claim of the '513 patent.

600. Atticus seeks a declaration that its Asenra G™ product does not and will not infringe any claim of the '513 patent, either literally or under the doctrine of equivalents.

## COUNT XXXI
### (Declaratory Judgment of Non-Infringement of the '756 Patent for Atticus's Asenra G™ Product)

601. Atticus repeats and realleges Paragraphs 1-601 of this Complaint as if fully set forth herein.

602. In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '756 patent and Atticus's intended making, using, selling, offer to sell, and/or importing of its Asenra G™ product.

603. Atticus has taken concrete steps to prepare to distribute and sell its Asenra G™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Asenra G™ product, such as the submission of the CSF for its Asenra G™ product, and developing marketing materials for its Asenra G™ product.

604. Atticus expects to receive EPA approval for its Asenra G™ product within three months of the filing of this action, and certainly long before the expiration of the '756 patent. Atticus further

expects to receive approval from one or more states shortly after receiving EPA approval.

605.    Upon EPA approval and any state approval for its Asenra G™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Asenra G™ product within the United States.

606.    FMC has not offered a covenant that it will not sue Atticus for infringing the '756 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Asenra G™ product within the United States.

607.    Atticus's Asenra G™ product does not infringe any claim of the '756 patent, either literally or under the doctrine of equivalents.

608.    In particular, every claim of the '756 patent requires "(c) about 30 to about 95% of at least one water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed."  Ex. 3 at col. 35.

609.    Atticus's Asenra G™ product does not meet all claim limitations, for example because it does not contain a "water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed," as required by every claim of the '756 patent.  Thus, for at least this reason, Atticus's Asenra G™ product does not meet each and every limitation of any claim of the '756 patent and therefore does not literally infringe the '756 patent.

610.    Atticus's Asenra G™ product does not contain an ingredient that could be deemed an equivalent to the claimed "methylated seed oil."  Specifically, no component in Atticus's Asenra G™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the methylated seed oil claimed in the '756 patent.  Furthermore, there are substantial differences between (a) each ingredient of Atticus's Asenra G™ product and (b) the "water-immiscible liquid carrier selected from the group consisting of a methylated seed oil of sunflower, soybean, cotton or linseed" limitation required for each claim of the '756 patent.

611.    Atticus seeks a declaration that its Asenra G™ product does not and will not infringe any claim of the '756 patent, either literally or under the doctrine of equivalents.

92

## COUNT XXXII
## (Declaratory Judgment of Non-Infringement of the
## '737 Patent for Atticus's Asenra G™ Product)

612. Atticus repeats and realleges Paragraphs 1-611 of this Complaint as if fully set forth herein.

613. In view of the allegations set forth herein, there is an actual, justiciable, substantial, and immediate controversy between Atticus and FMC concerning the '737 patent and Atticus's intended distribution and sale of its Asenra G™ product.

614. Atticus has taken concrete steps to prepare to distribute and sell its Asenra G™ product, including conducting the required research and formulation development work outside the United States, preparing and submitting all the requisite documentation and applications required by FIFRA and other regulatory provisions in order to distribute and sell its Asenra G™ product, such as the submission of the CSF for its Asenra G™ product, and developing marketing materials for its Asenra G™ product.

615. Atticus expects to receive EPA approval for its Asenra G™ product within 1-3 months of the filing of this action, and certainly long before the expiration of the '737 patent. Atticus further expects to receive approval from one or more states shortly after receiving EPA approval.

616. Upon EPA approval and any state approval for its Asenra G™ product, Atticus intends to begin importing, making, using, selling, and/or offering to sell its Asenra G™ product within the United States.

617. FMC has not offered a covenant that it will not sue Atticus for infringing the '737 patent, once Atticus begins making, using, selling, offering to sell, and/or importing its Asenra G™ product within the United States.

618. Atticus's Asenra G™ product does not infringe any claim of the '737 patent, either literally or under the doctrine of equivalents.

619. In particular, every claim of the '737 patent requires "(ii) a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a ($C_{12}$-$C_{16}$ alkyl)polyglycoside; an ethylene oxide-propylene oxide block copolymer consisting of 11 ethylene oxide-derived units, then 16 propylene oxide block copolymers and then 11 ethylene oxide-derived units; and

93

polyoxyethylene (20) sorbitan monolaurate." Ex. 4 at col. 40.

620.    Atticus's Asenra G™ product does not meet all claim limitations, for example because it does not contain "a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a (C$_{12}$-C$_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate," as required by every claim of the '737 patent.  Thus, for at least this reason, Atticus's Asenra G™ product does not meet each and every limitation of any claim of the '737 patent and therefore does not literally infringe the '737 patent.

621.    Atticus's Asenra G™ product does not contain an ingredient that could be deemed an equivalent to "a surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a (C$_{12}$-C$_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate."  Specifically, no component in Atticus's Asenra G™ product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the surfactant claimed in the '737 patent.  Furthermore, there are substantial differences between (a) each ingredient of Atticus's Asenra G™ product and (b) the "surfactant constituent selected from the group consisting of; dodecylbenzenesulfonic acid, sodium dodecylbenzenesulfonate; a (C$_{12}$-C$_{16}$ alkyl) polyglycoside . . . and polyoxyethylene (20) sorbitan monolaurate" limitation required for each claim of the '737 patent.

622.    Atticus seeks a declaration that its Asenra G™ product does not and will not infringe any claim of the '737 patent, either literally or under the doctrine of equivalents.

## PRAYER FOR RELIEF

WHEREFORE, Atticus requests the following relief:

A.      A judgment declaring that Atticus has not infringed and will not infringe, either literally or under the doctrine of equivalents, any claims of the '382, '516, '737, and '756 patents and declaring that the manufacture, use, sale, offer for sale, and/or importation of Atticus's Osaria™, Contigo™, Pixovere™, Asenra MC™, Asenra™, Asenra G™, Kylix™, and Osaria OPT™ products does not, and will not, infringe, literally or under the doctrine of equivalents, any claims of the '382, '516, '737, and '756 patents;

B.      A judgment that FMC and each of their officers, directors, agents, counsel, servants,

94

employees, affiliates, and all persons in active concert or participation with any of them, be restrained and enjoined from alleging, representing, or otherwise stating that Atticus or the manufacture, importation, use, sale, or offer for sale of Atticus's Osaria™, Contigo™, Pixovere™, Asenra MC™, Asenra™, Asenra G™, Kylix™, and Osaria OPT™ products infringe the '382, '516, '737, and '756 patents, or from instituting or initiating any action or proceeding alleging infringement of the '382, '516, '737, and '756 patents against Atticus and/or customers, manufacturers, users, importers, or sellers of Atticus's Osaria™, Contigo™, Pixovere™, Asenra MC™, Asenra™, Asenra G™, Kylix™, and Osaria OPT™ products;

C. A judgment declaring that Atticus is the prevailing party and that this is an exceptional case under 35 U.S.C. § 285 and awarding Atticus its reasonable attorney's fees, expenses, and costs in connection with this case; and

D. A judgment awarding Atticus such other relief as the Court may deem just and proper.

## JURY DEMAND

Atticus demands a jury trial on all claims and issues so triable.

This the 19th day of December, 2024.

/s/ Robert J. Morris
Robert J. Morris
(N.C. State Bar No. 15981)
SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN, LLP
150 Fayetteville Street, Suite 2300
Raleigh, NC 27601
Tel: (919) 821-1220
Facsimile: (919) 821-6800
jmorris@smithlaw.com

Matthew J. Dowd (D.C. Bar No. 998373)*
Robert J. Scheffel (D.C. Bar No. 489490)*
Elliot A. Gee (D.C. Bar No. 90001700)*
DOWD SCHEFFEL PLLC
1717 Pennsylvania Avenue, NW
Suite 1025
Washington, D.C. 20006
Tel: (202) 559-9175
mdowd@dowdscheffel.com

95

rscheffel@dowdscheffel.com
egee@dowdscheffel.com

*Attorneys for Plaintiff Atticus, LLC*

*\* Notices of Special Appearance to be filed*